No. 00-217

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 320

302 Mont. 508

15 P. 3d 893

STATE OF MONTANA,

Plaintiff and Appellant,

v.

DEBBIE CARLSON,

Defendant and Respondent.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Yellowstone,

The Honorable Maurice R. Colberg, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Hon. Joseph P. Mazurek, Attorney General; John Paulson,

Assistant Attorney General, Helena, Montana

Dennis Paxinos, Yellowstone County Attorney; Sheila Kolar,

Deputy County Attorney, Billings, Montana

For Respondent:

Stephen C. Mackey, Attorney at Law, Billings, Montana

Submitted on Briefs: September 21, 2000
Decided: December 12, 2000

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

¶1 The Defendant, Debbie Carlson, was charged by Information filed in the District Court for the Thirteenth Judicial District in Yellowstone County with felony and misdemeanor counts of Criminal Possession of Dangerous Drugs and with Criminal Possession of Drug Paraphernalia. The District Court granted Carlson's motion to suppress evidence seized by officers following seizure of her vehicle. The State appeals the District Court's suppression order. We affirm the order of the District Court.

¶2 The State raises a single issue on appeal:

¶3 Did the District Court correctly conclude that the canine sniff of the exterior of Carlson's vehicle was a search requiring a particularized suspicion?

FACTUAL BACKGROUND

¶4 On June 8, 1999, Ernest Bahm noticed a 1985 Chevy Astro van parked on his property. Bahm's property, located on Highway 3 North near the Billings Airport, was the subject of an ongoing dispute with his neighbors, Tina and Dale Southworth. Although he had previously noticed the van parked at the Southworth residence, Bahm did not know to whom the vehicle belonged. Bahm inspected the vehicle and discovered that it was locked and the windows were covered. Unable to move the van himself, Bahm contacted the Yellowstone County Sheriff's Office to report a suspicious vehicle.

¶5 Deputy Micky Eckart responded to Bahm's complaint. When Deputy Eckart met Bahm near the property on Highway 3, Bahm informed Eckart that a suspicious vehicle was on his property and gave Eckart the license plate number. Deputy Eckart radioed the sheriff's office dispatcher with the vehicle's license plate number and discovered that the van was registered to Debbie Carlson. Agent Gordon Hirschi of the Montana Narcotics Investigation Bureau was in the dispatcher's office and overheard Debbie Carlson's name. Before he could investigate the van, Deputy Eckart was called back to the

sheriff's office at Hirschi's request. Agent Hirschi then informed Deputy Eckart that Carlson and her boyfriend, Noel Morris, were under investigation for illegal drug activities. Hirschi's belief that Carlson was dealing drugs was based entirely on the statements of two confidential informants.

¶6 Agent Hirschi contacted Deputy Eckart's supervising officer, Lt. Mike Linder. Linder sent Deputies Eckart and Ellis back to the Bahm property for an investigation. Linder also requested that the canine officer from the Billings Police Department meet the deputies at the scene.

¶7 Deputies Eckart and Ellis drove onto Bahm's property along an access road which ran across the Southworth property. Tina Southworth met the officers as they entered the property. Southworth asked the officers what they were doing and they informed her that they were investigating a suspicious vehicle. She told the officers that the van belonged to her friend, Debbie Carlson.

¶8 Deputy Eckart approached the exterior of the van. Although most of the windows were covered, Eckart looked into a small uncovered window and saw someone inside who appeared to be wrapping a package with packing tape. Deputy Eckart identified himself and asked the person inside to come to the front of the van. A female voice responded, "Okay, I'll be there in a minute." Carlson then exited the van and identified herself.

¶9 Carlson was reluctant to provide further information. Eckart testified that he could see Carlson's heart beating, which led him to conclude that she was either extremely nervous or on drugs. When Eckart asked for her address and phone number, Carlson asked what his inquiry was all about. Eckart explained that he had received a complaint from Bahm about the van trespassing on his property.

¶10 Carlson then asked Tina Southworth to pull the van off of Bahm's property. Dale Southworth offered to move the van. Deputy Ellis advised the Southworths to leave the van where it was and not get involved. Approximately half an hour elapsed from the time the officers initially approached the van and the time that Agent Hirshci and Officer Feuerstein, the canine officer, arrived on the scene with Igor, the drug-sniffing dog. Carlson was not free to move the van or leave during that half hour.

¶11 After speaking with Eckart, Officer Feuerstein told Carlson that he was going to take the drug dog around the van. Carlson replied "Oh no, you're not. I'm going to move my car." Carlson got back in the van, locked the door, and attempted to move the van herself. Officer Feuerstein drew his sidearm, pointed it at Carlson, and ordered her to turn the engine off. Carlson complied and got back out of the van.

¶12 Officer Feuerstein deployed Igor to perform a sniff around the exterior of the van. The dog alerted on the driver's side door, indicating the presence of illegal drugs. The van was impounded and searched pursuant to a search warrant issued by District Court Judge G. Todd Baugh on June 10, 1999. The search resulted in the seizure of illegal drugs and drug paraphernalia. Carlson was not charged with criminal trespass.

## DISCUSSION

¶13 Did the District Court correctly conclude that the canine sniff of the exterior of Carlson's vehicle was a search requiring a particularized suspicion?

¶14 The standard of review for a district court's order to suppress evidence is whether the court's findings of fact are clearly erroneous and whether those findings were correctly applied as a matter of law. *State v. Henderson*, 1998 MT 233, ¶ 9, 291 Mont. 77, ¶ 9, 966 P.2d 137, ¶ 9.

¶15 The District Court held that the dog sniff of Carlson's van was a search requiring particularized suspicion. The District Court further concluded that there was insufficient particularized suspicion of illegal drug activity to allow the dog sniff and that the search warrant application, absent the dog sniff information, did not establish sufficient probable cause for the issuance of a search warrant.

¶16 The State argues that the District Court's ruling is in conflict with *State v. Scheetz* (1997), 286 Mont. 41, 950 P.2d 722. In *Scheetz*, we rejected the defendant's claim that the use of a drug-detecting canine to sniff luggage at an airport constituted a search in violation of the right to privacy guaranteed by Article II, Sections 10 and 11 of the Montana Constitution. The State would have us apply the same reasoning to the facts in this case.

¶17 The State raises the question of whether a dog sniff of the exterior of a vehicle is a search within the meaning of the United States and Montana Constitutions. The State urges us to address this issue of first impression in Montana. However, we conclude that resolution of the matter currently before us does not require analysis of whether a dog sniff is a search in the constitutional sense. When law enforcement officers seize a person, as during an investigative stop, the protections against unreasonable searches and seizures found in both the United States and Montana Constitutions attach. Should we determine that the District Court properly concluded that the State had an insufficient basis for detaining Carlson in the first place, then the question of whether the dog sniff was a search which invoked Carlson's Fourth Amendment rights does not matter. Therefore, based on the long-standing principle recognized in *State v. Still* (1995), 273 Mont. 261, 263, 902 P.2d 546, 548, that courts should avoid constitutional issues wherever possible, we conclude that we need not decide whether a dog sniff of the exterior of a vehicle is a search which implicates the federal and state constitutions.

¶18 The United States Supreme Court has held that the Fourth and Fourteenth Amendments are implicated during investigative stops. "[S]topping an automobile and detaining its occupants constitutes a 'seizure' within the meaning of [the Fourth and Fourteenth] Amendments, even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse* (1979), 440 U.S. 648, 653, 99 S. Ct. 1391, 1396, 59 L. Ed. 2d 660. The Fourth Amendment's prohibition against unreasonable search and seizure is invoked by investigative stops. *U.S. v. Cortez* (1981), 449 U.S. 411, 417, 101 S. Ct. 690, 694-95, 66 L. Ed. 2d 621. Montana has followed this line of reasoning. When a law enforcement officer seizes a person, such as during an investigative stop, constitutional protections against unreasonable searches and seizures attach. *State v. Broken Rope* (1996), 278 Mont. 427, 430, 925 P.2d

1157, 1159.

¶19 The Montana Legislature has codified the requirements for investigative stops:

> In order to obtain or verify an account of the person's presence or conduct or to determine whether to arrest the person, a peace officer may stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, or is committing, or is about to commit an offense.

Section 46-5-401, MCA. However, an investigative stop authorized by § 46-5-401 may not last longer than necessary to effectuate the purpose of the stop. Section 46-5-403, MCA.

¶20 The test for whether a seizure has occurred is, in light of the totality of the surrounding circumstances, whether a reasonable person would have believed that he or she was not free to leave. *State v. Roberts*, 1999 MT 59, ¶ 16, 293 Mont. 476, ¶ 16, 977 P.2d 974, ¶ 16. The District Court determined that Carlson was not free to leave the scene during her encounter with law enforcement officers. We agree. Bahm initially contacted the sheriff's office to report a possible trespass. Bahm testified that he simply wanted the van removed from his property. The officers could have allowed Carlson to move the van off of Bahm's property or charged Carlson with criminal trespass or both. They did neither. The Southworths offered to move the van and were told not to get involved. When Carlson herself tried to move the van she was ordered out of the vehicle at gunpoint by Officer Feuerstein. Carlson was clearly not allowed to leave the scene. Therefore, Carlson's detention constituted an investigative stop requiring particularized suspicion that she had committed or was committing the offense for which she was stopped.

¶21 We next decide whether the officers exceeded the permissible scope of an investigatory stop. Pursuant to § 46-5-403, an investigative stop authorized by § 46-5-401 may not last longer than necessary to effectuate the purpose of the stop. The United States Supreme Court has recognized the limited scope of investigative stops: "The scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer* (1983), 460 U.S. 491, 500, 103 S. Ct.1319, 1325, 75 L. Ed. 2d 229. We recognize that the purpose of the initial stop may change as officers acquire additional information. *See, e.g. State v. Henderson,* 1998 MT 233, 291 Mont. 77, 966 P.2d 137. However, we agree with the District Court's conclusion that the officers detained Carlson for longer than was necessary to effectuate the initial purpose of the stop, thereby transforming an otherwise lawful investigatory stop into a constitutionally deficient seizure.

¶22 Deputy Ellis testified that one-half hour elapsed between the arrival of the deputies and the arrival of the drug dog. However, it was unnecessary to detain Carlson that long to investigate a trespass, nor has she ever been cited for a trespass. This failure strongly suggests that the trespass investigation was pretext for performing a drug search with the assistance of a trained dog. Moreover, Deputy Eckart testified that drug-sniffing dogs are not normally deployed during the investigation of suspicious vehicles. Pursuant to the criminal trespass statute, § 45-6-203, MCA, the State only had to establish that

Carlson knowingly remained unlawfully upon the premises of another. *See, e.g. City of Helena v. Lewis* (1993), 260 Mont. 421, 860 P.2d 698. Therefore, the facts necessary to support a charge of criminal trespass, a misdemeanor, were readily apparent to the officers when they arrived at the Bahm property. A criminal trespass charge did not require a search of the exterior of Carlson's vehicle with a trained drug dog nor did it require Yellowstone County law enforcement officials to detain Carlson against her will. Consequently, we find that the record contained evidence sufficient to support the District Court's determination that the drug investigation exceeded the purpose of the initial stop.

¶23 Finally, we conclude that the officers did not have a particularized suspicion that Carlson's van contained illicit drugs. The officers had a particularized suspicion that allowed them to investigate the presence of Carlson's van on Bahm's property. However, that particularized suspicion was limited to accomplishing the narrow purpose of the trespass investigation. As we explained in *Hulse*:

> Once a lawful stop is made, a police officer's suspicions may become further aroused and the stop may become further prolonged and the scope enlarged as required by the circumstances, *provided the scope of the investigation remains within the limits created by the facts upon which the stop is predicated and the suspicion which they arouse*.

*Hulse v. State*, 1998 MT 108, ¶ 40, 289 Mont. 1, ¶ 40, 961 P.2d 75, ¶ 40 (citing *Terry v. Ohio* (1968), 392 U.S. 1, 21-22, 29, 88 S. Ct. 1868, 1879-81, 1883-84, 20 L. Ed. 2d 889 (emphasis added).

¶24 To satisfy the particularized suspicion standard, the State must first establish objective data from which an experienced officer can make inferences. *Broken Rope*, 278 Mont. at 431, 925 P.2d at 1159. The State must then show a resulting suspicion that the person is, or has been, engaged in wrongdoing or was a witness to criminal activity. *Broken Rope*, 278 Mont. at 431, 925 P.2d at 1159. Here, the investigating officers relied on objective data which allowed them to infer that a trespass was occurring-the presence of a vehicle registered to Carlson parked on private property owned by Bahm. However, the record demonstrates that the officers did not have objective data which allowed them to investigate the possible existence of illegal drugs in Carlson's van at the time they detained Carlson and thereby implicated her state and federal constitutional right to be free from unreasonable searches and seizures.

¶25 The record of the suppression hearing contains the following exchange between Deputy Eckart and defense counsel:

> Q Had you ever dealt with Debbie Carlson before?
>
> A No.
>
> Q Do you-do you search all vehicles that you find that are parked on somebody else's property when you get a suspicious vehicle call?
>
> . . . .

A No.

Q Do you always call drug dogs to come and sniff around a vehicle you find on other people's property?A Not always, no.

. . . .

Q Did you have any evidence that Debbie Carlson had ever been convicted of drug possession?

A No, sir.

Q Did you ever have any evidence that Debbie Carlson had been arrested [for] drug possession?

A No, sir.

Q You have any evidence that Debbie Carlson had been charged with drug possession?

A No, sir.

. . . .

Q You had no evidence at this time that there were any drugs in that vehicle, did you?

A No.

¶26 Later in the proceedings defense counsel cross-examined Agent Hirschi:

Q Debbie Carlson, up to that point and time, had never been convicted of possession of dangerous drugs, had she?

A Not to my knowledge.

Q She had never been charged with possession of dangerous drugs, had she?

A Not to my knowledge.

Q She had never been found in the possession of paraphernalia, had she?

A Not to my knowledge.

Q Or charged or arrested for that?A Not to my knowledge.

Q And you say you'd been investigating her for several months?

A Several months.

Q And after several months of investigation, you didn't have enough evidence to charge her with a crime at this point, did you?

A No, I did not.

Q And this particular van that she was driving, to your knowledge had drugs ever been found in it?

A This was the first time that I was aware of the van, so I-I don't know.

Q So you had no knowledge that there had ever been any drugs connected to that van at any time?

A That's correct.

Q And when you spoke to Officer Linder, obviously, you didn't tell him that there were, in fact, drugs in that van at this time because you didn't know if there were or not, did you?

A No, I did not know that.

Q Had you ever even seen that van before?

A I don't believe so.

. . . .

Q You had no facts to indicate that at this point and time on that day in that van that there were drugs present in that vehicle, did you?

A No particular facts, no.

¶27 The evidence in the record supports the District Court's finding and conclusion that the officers lacked sufficient particularized suspicion of illegal activity involving possession of drugs or contraband to detain Carlson or seize her vehicle. The record also supports the District Court's conclusion that the initial investigatory stop for trespass exceeded that narrow purpose by the time the dog arrived. Accordingly, we hold that by the time the drug-sniffing dog arrived, officers had detained Carlson and

conducted an investigatory stop without sufficient objective data to create a particularized suspicion that Carlson possessed dangerous drugs or drug paraphernalia. Therefore, we affirm the District Court's suppression order.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ KARLA M. GRAY

/S/ JIM REGNIER

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART