No. 99-518

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 139

CAPE-FRANCE ENTERPRISES,

A Montana Partnership,

Plaintiff and Respondent,

v.

THE ESTATE OF LOLA H. PEED,

a/k/a LOLA PEED, f/k/a LOLA H.

JOHNSON, DECEASED

AND MARTHE E. MOORE,

Defendants and Appellants.

APPEAL FROM: District Court of the Eighteenth Judicial District,

In and for the County of Gallatin,

The Honorable Mike Salvagni, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Carl A. Hatch, John C. Doubek, Small, Hatch, Doubek & Pyfer, Helena, Montana

For Respondent:

Calvin L. Braaksma, Landoe, Brown, Planalp, Braaksma & Reida, Bozeman, Montana

Submitted on Briefs: April 12, 2001
Decided: August 2, 2001

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Cape-France Enterprises brought this action to rescind an agreement between the parties for the sale of a tract of land in Bozeman, Montana. On cross-motions for summary judgment the District Court granted summary judgment in favor of Cape-France. The Estate of Lola Peed and Marthe Moore appeal from the District Court's order granting summary judgment in favor of Cape-France. We affirm.

¶2 The dispositive issue on appeal is restated as follows:

¶3 **Whether the District Court correctly concluded that the parties' buy-sell agreement was unenforceable on the grounds of impossibility or impracticability and correctly refused to order specific performance.**

## FACTUAL AND PROCEDURAL HISTORY

¶4 Cape-France Enterprises (Cape-France), is the owner of a tract of real property in Bozeman, Montana. Lola Peed[1] and her granddaughter Marthe Moore (Peed and Moore) wished to buy a portion of that tract of land in order to build a motel or hotel. The two parties worked through a real-estate agent in the arrangement of this transaction.

¶5 Cape-France entered into a buy-sell agreement in 1994 with Peed and Moore for the purchase of a five acre portion of their land that was to be surveyed. The land had not been subdivided at the time of the agreement and needed to be subdivided and re-zoned in order for the sale to be completed. Closing was supposed to take place in September of 1994 but

a plat creating the tract at issue was never recorded and the subdivision and closing never took place.

¶6 The parties attempted to accomplish subdivision of the property but several obstacles presented themselves. First, difficulties were encountered with the state and local agencies responsible for approving the subdivision. According to the depositions, application files were lost by the state more than once, which caused delays. Second, the parties encountered difficulty in obtaining water, which ultimately needed to be procured in order for subdivision to be approved. Water was not available to the land at the time the agreement was made. According to the agreement, it was the responsibility of Peed and Moore, as buyers, to bring water to the property. City water was not available, so presumably, a well would have to be drilled for that water.

¶7 To complicate matters further, a pollution plume was spreading through the groundwater in Bozeman in the area of the tract in question. Sometime during this process, it was discovered that the plume was closer to the land than had been expected. It is not clear where the pollution plume had moved, but state and local officials feared that it may have spread, possibly underneath the tract.

¶8 The potential presence of the pollution plume presented an obstacle to the parties' ability to subdivide the property. Ultimately, the Department of Environmental Quality, Water Quality Division (DEQ) warned Cape-France that the subdivision would not be approved unless a well was first drilled and tested. DEQ also warned that the pollution plume may have advanced under Cape-France's property and if the testing of the well water showed pollution in the water, the necessary treatment of this water would be extensive. Further, DEQ warned that if the drilling or pumping of the water caused expansion of the pollution, Cape-France, as the owner of the property, would be held liable for the clean-up costs. This warning took place after the subdivision process was commenced, making it clear to Cape-France that the completion of water drilling and testing was required before subdivision would be approved. According to the record, drilling and testing still have not been completed.

¶9 The warning came in December of 1995, when Cape-France received a notice from DEQ, which informed it that the property was located within a groundwater contamination site:

This letter is to inform you that perchlor[o]ethylene (PCE) has been detected in a

well near the north boundary of old Highway 10 . . . . The contamination appears to be extending north but the extent of the contamination is unknown. You and your client need to be aware of the consequences resulting from drilling wells in the vicinity of the plume. Water supply wells drilled in your proposed subdivision may tap contaminated groundwater or may become contaminated over time with pumping. If contaminated groundwater is encountered then advanced treatment of the water will be required. The legal owners of the subdivision lots will be liable under the Water Quality Act or other environmental laws (state or federal) if pollution results from improper well construction or if contaminated groundwater is pumped into a clean area.

¶10 Although the parties appear to have been aware of the existence of a pollution plume in Bozeman, presumably originating from a dry cleaner in the area, they believed the property at issue to be unaffected until receiving this notice.

¶11 A second letter was sent by DEQ to Cape-France, informing the partners that before subdivision could be approved:

A well must be drilled and pump tested per WQB 3 3.2.4. Also, the well must be sampled for VOCs in accordance with EPA method 524.2. The well that is drilled and tested should be the proposed well that is closest to the Bozeman Solvent Site.

¶12 The District Court ruled, on cross-motions for summary judgment, that the agreement could be rescinded on the basis of mutual mistake of fact, impossibility and impracticability of performance and that specific performance would not be granted.

## STANDARD OF REVIEW

¶13 Our standard of review on appeal from summary judgment rulings is de novo. See *Motarie v. N. Mont. Joint Refuse Disposal* (1995), 274 Mont. 239, 242, 907 P.2d 154, 156, *Mead v. M.S.B., Inc.* (1994), 264 Mont. 465, 470, 872 P.2d 782, 785. When we review a district court's grant of summary judgment, we apply the same evaluation as the district court based on Rule 56, M.R.Civ.P., *Bruner v. Yellowstone County* (1995), 272 Mont. 261, 264, 900 P.2d 901, 903. The movant must demonstrate that no genuine issues of material fact exist. Once this has been accomplished, the burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue does exist. *Bruner*, 272 Mont. at 264, 900 P.2d at 903.

¶14 Ordinarily, such a review requires that we first determine whether the moving party met its burden of establishing both the absence of genuine issues of material fact and entitlement to judgment as a matter of law. *Jarrett v. Valley Park, Inc.* (1996), 277 Mont. 333, 338, 922 P.2d 485, 487. In this case, however, the facts are undisputed. Through their cross-motions for summary judgment, each party asserted entitlement to judgment as a matter of law. Therefore, our review is confined to the District Court's conclusions of law. We review a district court's conclusions of law to determine whether the court's interpretation of the law is correct. *Carbon County v. Union Reserve Coal Co., Inc.* (1995), 271 Mont. 459, 469, 898 P.2d 680, 686.

## DISCUSSION

¶15 **Whether the District Court correctly concluded that the parties' buy-sell agreement was unenforceable on the grounds of impossibility or impracticability, and correctly refused to order specific performance.**

¶16 Cape-France argues, and the District Court determined, that the contract should be rescinded because the spread of the pollution and the potential liability involved with drilling a well made subdivision of the property impossible or impracticable.

¶17 This Court has observed that, "impossibility of performance is a strict standard that can only be maintained where the circumstances truly dictate impossibility. The general rule is that, where a party to a contract obligates himself to a legal and possible performance, he must perform in accordance with the contract terms." *Barrett v. Ballard* (1980), 191 Mont. 39, 44, 622 P.2d 180, 184 (citation omitted). See also, *360 Ranch Corp. v. R&D Holding* (1996), 278 Mont. 487, 926 P.2d 260. However, "[i]mpossibility encompasses not only strict impossibility but impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved." *Smith v. Zepp* (1977), 173 Mont. 358, 364, 567 P.2d 923, 927, quoting the Restatement of Contracts, Section 454.

¶18 The Montana Code allows for rescission of a contract based on impossibility, under § 28-2-603, MCA, providing:

> Where a contract has but a single object and such object is unlawful, whether in whole or in part, or wholly impossible of performance, or so vaguely expressed as to be wholly unascertainable, the entire contract is void.

¶19 Rescission of a contract under the doctrine of impossibility or impracticability, while a strict standard, is not limited to literal impossibility, but also encompasses impracticability. As observed by the Fourth Circuit Court of Appeals:

> [M]odern authorities [have] abandoned any absolute definition of impossibility and, following the example of the Uniform Commercial Code, have adopted impracticability or commercial impracticability as synonymous with impossibility in the application of the doctrine of impossibility of performance as an excuse for breach of contract. *Opera Co. of Boston v. Wolf Trap Foundation* (4th Cir. 1987), 817 F.2d 1094, pp. 1098.

¶20 Commentators in this area of contracts have also noted the broadening scope of the doctrine of impossibility or impracticability. Corbin observes that the modern doctrine of impossibility of performance is one, "invented by the court in order to supplement the defects of the actual contract" in the interest of reason, justice and fairness. 6 Corbin, *Contracts* § 1331, p. 360. In addition, Williston views the enlargement of the doctrine as making it "essentially an equitable defense, [which could] . . . be asserted in an action at law" 18 Williston, *Contracts*, § 1931, p. 6.

¶21 The Restatement Second of Contracts explains that:

> Even where the obligor has not limited his obligation by agreement, a court may grant him relief. An extraordinary circumstance may make performance so vitally different from what was reasonably to be expected as to alter the essential nature of that performance. In such a case the court must determine whether justice requires a departure from the general rule that the obligor bear the risk that the contract may become more burdensome or less desirable."

¶22 The doctrine of impossibility found in the Restatement is relied upon by various courts. The Michigan Court of Appeals in *Bissell v. L.W. Edison Company* (1967), 156 N.W.2d 623, 626, relying on the Restatement of Contracts, Section 457, concluded that the doctrine of impossibility is a valid defense not only when performance is impossible, but also when supervening circumstances make performance impracticable. Section 457 of the Restatement of Contracts, now Section 261 of the Restatement (Second) of Contracts (1981) provides:

> **Discharge by Supervening Impracticability Where, after a contract is made, a**

**party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary. Restatement Second of Contracts, § 261, p. 313.**

The court observed that Section 261 defines impossibility to include, "not only strict impossibility but impracticability because of extreme and unreasonable difficulty, expense, injury and loss involved." *Bissell,* 156 N.W.2d at 626.

¶23 Courts may determine that an act is "impossible" in legal contemplation when it is not practicable. Such an act is impracticable when it can only be done at an excessive, unreasonable and unbargained-for cost. While the doctrine of impossibility or impracticability is not set in stone, it is applied by courts where, aside from the object of the contract being unlawful, the public policy underlying the strict enforcement of contracts is outweighed by the senselessness of requiring performance.

¶24 The doctrine is applicable under the facts in the case at bar. As the District Court noted in its Memorandum and Order:

> [I]t is undisputed that after the agreement was executed, the state and local regulatory authorities required the completion of water drilling and testing. The parties discussed the situation. Cape France was unwilling to assume large risks related to this new, unknown and unexpected situation. Peed- Moore was unwilling to provide Cape-France with an indemnity agreement and bond which was satisfactory to Cape-France.

Contamination, if it exists or occurs by reason of well-drilling, could expose Cape-France as landowners to financial liability of an unquantifiable nature. The DEQ's letters dated December 21, 1995 and January 12, 1996, contained information that the subdivision would not be approved unless a satisfactory well was drilled, and noted that the proposed subdivision could be in an area of groundwater contamination.

¶25 Peed and Moore argue that the contract should not be rescinded on the basis of impossibility because it is not impossible to drill the well. They point to the letters as evidence that the well could be drilled and that there is no proof that there would be actual groundwater contamination where they would drill. However, Peed and Moore do not

argue, and cannot argue, that there is no groundwater contamination, nor can they say that there will not be any in the future. Unfortunately, the only way to determine whether there is and, if so, the extent of groundwater contamination is to drill a well. And that is the precise activity that may exacerbate the contamination problem, to both party's substantial and unbargained-for economic detriment. Indeed, it is clear that Peed and Moore are unwilling or unable to share in these economic risks.

¶26 Moreover, as already noted, while impossibility or impracticability is a high standard, the application of this doctrine is not limited to cases of literal impossibility. Here, the potential for substantial and unbargained-for damage involved in performing the contract is not only of an economic nature. Just as importantly, environmental degradation with consequences extending well beyond the parties' land sale is also a real possibility.

¶27 It is undisputed that the water system required for subdivision may tap into contaminated groundwater and that pumping this water could spread the pollution plume further into other, uncontaminated aquifers.

¶28 Perchloroethylene is a dangerous substance. Reports from the United States Environmental Protection agency link contact with PCE to human health hazards as well as with other adverse environmental effects. Health risks to humans may include developmental toxicity, cancer, liver and kidney dysfunction, as well as short and long term effects on the nervous system. PCE is also toxic to aquatic life such as fish and algae. See, Cleaner Technologies Substitutes Assessment: Professional Fabricare Processes, U.S. Environmental Protection Agency, Chapter Five, June 1998, EPA Doc 744-B-98-001.

¶29 We agree with the District Court's assessment. The record reflects that in order for Cape-France to proceed further with the subdivision and zoning issues it would be forced to expose itself, not only to substantial and unbargained-for economic risks but, as well, the public would be exposed to potential health risks and possible environmental degradation.

¶30 Peed and Moore, nonetheless, argue that potential liability is not a reason to rescind a contract. They argue that the courts should force the parties to go through with the contract. In the context of this case, however, this argument ignores an important--and, in fact, a decisive--point.

¶31 Montana's Constitution, Article II, Section 3, guarantees all persons in this state the

right to a clean and healthful environment. This guarantee is a fundamental right that may be infringed only by demonstrating a compelling state interest. *MEIC v. Department of Environmental Quality*, 1999 MT 248, ¶ 63, 296 Mont. 207, ¶ 63, 988 P.2d 1236, ¶ 63, (recognizing that the right to a clean and healthful environment is a fundamental right because it is guaranteed by the Declaration of Rights in Montana's Constitution.) We have stated that a compelling state interest is, "at a minimum, some interest 'of the highest order and . . . not otherwise served' " or " 'the gravest abuse[], endangering [a] paramount [government] interest[]' ." *Armstrong v. State*, 1999 MT 261, 296 Mont. 361, 989 P.2d 364, at fn 6.

¶32 Moreover, interrelated with and interdependent upon Montanans' fundamental Article II, Section 3 right to a clean and healthful environment is the mandate provided in Article IX, Section 1, of our Constitution. This provision provides, in pertinent part, that "the State and each person shall *maintain and improve* a clean and healthful environment in Montana for present and future generations. . . . " While *MEIC* involved state action, we, nonetheless, recognized that the text of Article IX, Section 1 applies the protections and mandates of this provision to private action--and thus to private parties--as well. *See, MEIC,* ¶ 64.

¶33 In light of these two provisions of Montana's Constitution, it would be unlawful for Cape-France, a private business entity, to drill a well on its property in the face of substantial evidence that doing so may cause significant degradation of uncontaminated aquifers and pose serious public health risks. As already noted, a contract may be rescinded where the object of the contract is unlawful. Section 28-2-603, MCA.

¶34 Moreover, for a court to mandate specific performance of the contract at issue on the record here, would not only be to require a private party to violate the Constitution--a remedy that no court can provide--but, as well, would involve the state itself in violating the public's Article II, Section 3 fundamental rights to a clean and healthful environment, and in failing to maintain and improve a clean and healthful environment as required by Article IX, Section 1.

¶35 Furthermore, the law's interest in enforcing a contract for a land sale between two private parties is hardly the sort of compelling state interest under the criteria that we discussed in *Armstrong* that would justify this, or any court, ordering specific performance of the parties' agreement given the fundamental constitutional rights at issue and the substantial risk of violating those rights as demonstrated by the record here.

¶36 As already noted, State and local officials required the drilling of a water well on Cape-France property in order for the subdivision to be approved, but warned that if the required well tapped into contaminated water and spread that contamination to the Cape-France property, adjacent property or other aquifers, Cape France would be liable for the contamination and subsequent cleanup under state and federal laws.

¶37 Causing a party to go forward with the performance of a contract where there is a very real possibility of substantial environmental degradation and resultant financial liability for clean up is not in the public interest; is not in the interests of the contracting parties; and is, most importantly, not in accord with the guarantees and mandates of Montana's Constitution, Article II, Section 3 and Article IX, Section 1.

¶38 Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ PATRICIA COTTER

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER

Justice W. William Leaphart, concurring:

¶39 I specially concur in the in the Court's resolution of the issue presented.

¶40 The Court states the issue on appeal as follows: Whether the District Court correctly concluded that the parties' buy-sell agreement was unenforceable on the grounds of impossibility or impracticality and correctly refused to order specific performance? This Court, relying on the doctrine of impossibility of performance, Restatement (Second) of Contracts (1981), affirms the District Court's assessment that the drilling of a well would expose not only Cape-France but the public to potential health risks and possible environmental degradation. The Court, however, then goes on to further conclude that requiring Cape-France to go forward with performance (drilling of a well) where there is a very real possibility of substantial environmental degradation would violate the guarantees and mandates of Montana's Constitution, Article II, Section 3, and Article IX, Section 1.

¶41 This Court recognizes the long-standing principle that courts should avoid constitutional issues wherever possible. *State v. Carlson*, 2000 MT 320, ¶ 17, 302 Mont. 508, ¶ 17, 15 P.3d 893, ¶ 17; *S.L.H. v. State Compensation Mutual Ins. Fund*, 2000 MT 362, ¶ 14, 303 Mont. 364, ¶ 14, 15 P.3d 948, ¶ 14; and *Wolfe v. State Dept. of Labor Ind.* (1992), 255 Mont. 336, 339, 843 P.2d 338, 340. Having resolved the issue presented under the impossibility of performance doctrine, I would not address the constitutional issues.

/S/ W. WILLIAM LEAPHART

Justice Jim Rice dissenting:

¶42 I respectfully dissent. In my view, the majority misapplies the contract doctrine of impossibility and impracticability. Moreover, I believe this case can and should be resolved without reaching the constitutional issues-and without the sweeping constitutional holding- reached by the majority.

¶43 The majority reasons that the facts here are undisputed, as each party asserted entitlement to judgment as a matter of law in filing cross-motions for summary judgment. However, the parties did not stipulate to the facts and argued different versions thereof to this Court and to the court below. Neither the District Court nor this Court is obliged to assume that the facts are undisputed when considering cross-motions for summary judgment-and for good reason. As discussed herein, key facts to the proper adjudication of the doctrine of contract impracticability have been overlooked and misapprehended. I believe the District Court in the present case improperly concluded there were no issues of material fact and misinterpreted the law. As such, I would reverse and remand for further proceedings.

## CONTRACT ISSUES

¶44 In affirming the District Court's order rescinding the parties' contract, the majority, in my view, unnecessarily expands the doctrine of contract impossibility, in contravention to our case law, and fails to use the abundant caution necessary when applying a rule which allows a party to cancel its contractual obligations. We have previously observed that the starting point for an analysis of impossibility of performance in Montana is the principle that "[i]mpossibility of performance is a strict standard that can only be maintained where the circumstances truly dictate impossibility." *360 Ranch Corp. v. R & D Holding* (1996),

278 Mont. 487, 493, 926 P.2d 260, 263 (citing *Barrett v. Ballard* (1980), 191 Mont. 39, 44, 622 P.2d 180, 184). Without mention of *360 Ranch Corp*., the majority turns to secondary authority to expand the doctrine to include impracticability. Whether or not this is an advisable course of action, the majority fails, improperly in my view, to consider whether the event rendering performance impracticable was foreseeable and whether the risk was assumed by the parties. Further, the majority provides only a vague standard for application of the doctrine: "[T]he doctrine of impossibility or impracticability is . . . applied by courts where . . . the public policy underlying the strict enforcement of contracts is outweighed by the senselessness of requiring performance." I respectfully submit that the Court, in employing such vague concepts, has done a disservice to fundamental contract law which will create considerable uncertainty.

¶45 The Court relies on *Opera Co. of Boston v. Wolf Trap Foundation for Performing Arts* (4th Cir. 1987), 817 F.2d 1094, as authority for the doctrine of impossibility and impracticability. However, for unstated reasons, the Court does not apply the three-part test set forth in *Opera Co. of Boston* to the facts of this case. In *Opera Co. of Boston,* a musical performance was canceled due to a severe lightning storm that disrupted the power supply. The opera company sought payment notwithstanding, claiming they were ready and able to perform their duties under the contract. The Fourth Circuit thoroughly recited the evolution of the doctrines of impossibility and impracticability from the 1800's to current jurisprudence, and identified the widely accepted three-part test to be used when these doctrinal defenses are asserted in a contract action. A party relying on the defense must establish (1) the unexpected occurrence of an intervening act; (2) the occurrence was of such a character that its non-occurrence was a basic assumption of the agreement of the parties; and (3) that occurrence made performance impracticable. When all of these elements are established, the defense is made out. *Opera Co. of Boston*, 817 F.2d at 1102.

¶46 Because the occurrence must be unexpected, foreseeability of the occurrence is inherent to the application of the test. In *Opera Co. of Boston*, the court said:

> Foreseeability . . . is at best but one fact to be considered in resolving first how likely the occurrence of the event in question was and, second whether its occurrence, based on past experience, was of such reasonable likelihood that the obligor should not merely foresee the risk but, because of the degree of its likelihood, the obligor should have guarded against it or provided for non-liability against the risk. This is a question to be resolved by the trial judge after a careful scrutiny of all the facts in the case.

*Opera Co. of Boston,* 817 F.2d at 1102-1103. The appellate court then remanded the case to the trial court for a factual determination of whether the intervening occurrence-a thunder storm disrupting the power supply-was potentially foreseeable, and whether the obligor should have provided for non-liability or otherwise guarded against it. In contrast to Opera Co. of Boston, the case before us does not involve anything as arguably unpredictable as the weather, making the need for proper application of the doctrine even more compelling.

¶47 Here, the seller had actual and advance knowledge of the potential for the spreading of the underground pollution. Indeed, the District Court determined, "the undisputed facts show that Cape-France was aware that the plume extended from Buttrey's and was moving northwesterly towards the subject property." Despite this knowledge, Cape-France, an experienced developer, entered into a contract to sell the property to Peed and Moore and made no effort to guard against the potential occurrence or to provide for potential liability.

¶48 It should not have come as a surprise to Cape-France when it was notified by the Department of Environmental Quality that a testing requirement would be imposed upon the proposed subdivision to be certain that the underground perchlorethylene plume had not advanced to the vicinity. However, the District Court characterized this regulatory requirement as a "new, unknown and unexpected development," that "could expose Cape-France as landowners to liability exposure of an unquantifiable nature." On this basis, the District Court concluded that "[i]t was impossible for Cape-France to proceed further with the subdivision and zoning issues without exposing itself to a huge risk," and therefore, Cape-France's performance of the contract was rendered impracticable.

¶49 In affirming the District Court, the majority ignores the issue of foreseeability by relying on § 261 of the Restatement (Second) of Contracts, which does not require the impracticability event itself to be unexpected. Rather, § 261 refers to those situations where "performance has unexpectedly become impracticable as a result of a *supervening* event." Restatement (Second) of Contracts § 261, cmt. a. (1981) (emphasis supplied). A supervening event is one which occurs *after* the contract is made. The record is clear that neither the plume, nor the relevant subdivision and environmental laws, are the result of events which occurred after the contract in the present case was made. These pre-existed the contract.

¶50 If this Court is going to turn to the Restatements for guidance, either § 264 or § 266 of the Restatement (Second) of Contracts would be more applicable. Section 264 is an extension of § 261, but addresses those specific instances where a contractual duty is rendered impracticable by supervening governmental action:

§ 264. PREVENTION BY GOVERNMENTAL REGULATION OR ORDER. If the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order is an event the non-occurrence of which was a basic assumption on which the contract was made.

Section 264 suggests wide latitude in interpreting the terms "regulation" and "order." Thus, the Court could take the view that DEQ's determination to require a test well, though based on laws and regulations which pre-existed the contract, were supervening governmental orders. However, the Restatement would still require the Court to consider whether the regulatory impediments at issue were foreseeable and the risks voluntarily assumed by the parties. As the official Comment recognizes:

> With the trend toward greater governmental regulation, however, parties are increasingly aware of such risks, and a party may undertake a duty that is not discharged by such supervening governmental actions, as where governmental approval is required for his performance and he assumes the risk that approval will be denied (Illustration 3). Such an agreement is usually interpreted as one to pay damages if performance is prevented rather than one to render a performance in violation of law.

Illustration 3, § 264, cmt. 1 (1981), Restatement (Second) of Contracts, is particularly instructive and is set forth below:

> A, a manufacturer of sewage treatment equipment, contracts to design and install a central sewage treatment plant, for which B, a developer of a residential subdivision, contracts to pay. The parties understand that A must obtain the approval of the state Department of Health before installation. A is unable to install the plant because the Department of Health disapproves the plans. If the court concludes, on the basis of A's experience and the absence of any limitation in the contract, that A assumed the risk that approval would be denied, it will decide that A's duty to install the plant is not discharged and that A is liable to B for breach of contract. Cf. Illustration 3 to § 266.

Thus, if the Court has determined that *supervening* events impeded Cape-France's performance, the Court should apply § 264, Restatement (Second) of Contracts, and then consider whether Cape-France assumed such a risk under the contract.

¶51 Alternatively, the Court could have determined that both the perchlorethylene plume and the environmental and subdivision regulations existed at the time the contract was made, and turned to § 266. Section 266 provides, in pertinent part, as follows:

§ 266. EXISTING IMPRACTICABILITY OR FRUSTRATION
(1) Where, at the time a contract is made, a party's performance under it is impracticable without his fault because of a fact of which he has no reason to know and the non-existence of which is a basic assumption on which the contract is made, no duty to render that performance arises, unless the language or circumstances indicate the contrary. . . .

Under either approach, the Court should analyze whether Cape-France had reason to know the subject property might be exposed to perchlorethylene, that such a possibility could impede the subdivision process, and whether such knowledge precluded a determination that Cape-France was excused from performance. Both parties find support in the record for contrary arguments regarding whether Cape-France should have been aware of potential contamination problems and whether Cape-France assumed such risks under the contract. Therefore, I would find that there are questions of material fact on these issues which would preclude summary judgment.

¶52 Additionally, I believe there were questions of material fact regarding whether performance was actually impracticable which should have precluded summary judgment. The record is not at all clear that Cape-France would have been subject to liability of an unquantifiable nature had it drilled the test well at issue. The basis for the District Court's determination that summary judgment was appropriate were the letters from the Department of Environmental Quality to Cape-France and its agents. On December 21, 1995, the Department wrote Mr. Springer, the engineer hired by Cape-France, stating as follows:

The contamination appears to be extending north but the extent of the contamination is unknown. You and your client need to be aware of the consequences resulting from drilling wells in the vicinity of the plume. *Water supply wells* drilled in your proposed subdivision may tap contaminated groundwater or may become contaminated *over time* with pumping. If contaminated groundwater is encountered then advanced treatment of the water will be required. The legal owners of the subdivision lots will be liable under the Water Quality Act or other environmental laws (state or federal) if pollution results from improper well construction or if

contaminated groundwater is pumped into a clean area . . . . At this point you should consider *drilling a well on the site, conducting a pump test* per WQB 3, 3.2.4, and sample for VOCs per EPA Method 524.2 . . . [Emphasis added.]

¶53 The Department again wrote to Cape-France in January, 1996, this time notifying Cape-France that the subdivision was almost ready to be approved, and again requesting that the seller complete the well testing requirement:

Two items must be satisfied before the Department can issue approval on this subdivision:

> 1) A well must be drilled and *pump tested* per WQB 3, 3.2.4 . . . .

> 2) A plat of the proposed subdivision must be provided.

> [Emphasis added.]

¶54 The District Court then erroneously confused the two different and distinct messages which were conveyed to Cape-France by the Department's letters. First, considering the possible effect of contamination in the area, the Department advised Cape-France, as the subdivision applicant, that future *water supply wells* drilled to supply the ongoing water needs for the subdivision, may, "over time," become contaminated, require treatment, and impose liability. Secondly, in light of that possibility, the Department advised that it was imposing a subdivision requirement upon Cape-France to drill a *pump test well*. The purpose of the *pump test well* was not to provide for the subdivision's water supply, but to determine whether the plume had yet affected the property.

¶55 Mistakenly assessing this evidence, the District Court erroneously concluded that the drilling of a *pump test well* would impose upon Cape-France a potential "liability of an unquantifiable nature." This Court then incorporated the District Court's error into its opinion:

> Unfortunately, the only way to determine whether there is [contamination] and, if so, the extent of groundwater contamination is to drill a well. And that is the precise activity that may exacerbate the contamination problem. . . . .

The majority has mistakenly confused the drilling of a test well-the standard and accepted method of determining the location of the contamination-with the operation of future

supply wells. A test well is not the "precise activity" that may exacerbate the contamination problem. Rather, the Department warned that the long term pumping of water supply wells on the property would present this risk.

¶56 The further significance of this error is understood when the terms of the parties' contract are considered. Pursuant thereto, Cape-France was the subdivision applicant and responsible for obtaining subdivision approval, an effort spearheaded by its engineer, Lowell Springer. It was Cape-France's obligation to drill the *test well* as a condition of subdivision approval. Thereafter, it was the specific contractual obligation of buyer Peed-Moore to provide water for the property's future development plans, and to address the long-term water supply issue. As such, it was Peed-Moore who was required under the contract to complete the future task which bore the potential "liability of an unquantifiable nature" about which the Department had warned.

¶57 Perhaps realizing this, Cape-France argued that Peed-Moore failed to indemnify them against any future pollution that Peed-Moore may cause on the property. While such indemnifications may not be unusual, Cape-France, experienced developers, chose not to ask for one at the time of their bargain in June 1994. Nor did they ask for an indemnification at the time they signed the Extension Agreement, approximately two months after consummation of the buy-sell agreement, even though at all times they had actual knowledge of the advancing plume. Furthermore, under the parties' agreement, Cape-France agreed to assume the risk of loss until closing. If the facts, now unknown, would establish that Cape-France had sufficient knowledge of the contamination potential and then assumed such risks, the contractual provision would bar Cape-France's demand for indemnification, and its failure to perform would not be excused for this reason.

¶58 The Department's letter did intimate that Cape-France could be held responsible if contamination resulted from faulty well construction or testing and that advance treatment would be required if contaminated groundwater were encountered. However, the record is unclear in several important respects: (1) the likelihood that test wells could be safely drilled; (2) whether advance treatment of contaminated groundwater would be required as a condition of subdivision and who would be responsible; and (3) the actual cost of either the advance treatment of contaminated water or the clean up of contamination resulting from a faulty well. Indeed, both parties hold up the record to argue contrary positions regarding these factual matters. Thus, there are questions of material fact as to Cape-France's liability- and, therefore, the impracticability of performance-which should have precluded summary judgment.

¶59 Finally, I would also hold the District Court erred in granting summary judgment on the grounds of mutual mistake, for largely the same reasons. Regarding the defense of mutual mistake, we have stated the following:

> A mutual mistake occurs when the contracting parties share a common misconception about a vital fact upon which they based their bargain. *Mitchell v. Boyer* (1989), 237 Mont. 434, 437, 774 P.2d 384, 386. Parties cannot avoid a contract because of mutual mistake, however, if they bear the risk of a mistake. Restatement (Second) of Contracts §152 (1979). Parties bear the risk of a mistake when they know they have limited knowledge regarding the facts to which the mistake relates at the time the contract is made and treat their limited knowledge as sufficient. Restatement (Second) of Contracts §154(b) (1979).

*Wray v. State Compensation Insurance Fund (1994),* 266 Mont. 219, 225, 879 P.2d 725, 728. As I noted above, there are questions of material fact regarding whether and to what extent the parties were aware of the risks of potential groundwater contamination and whether they assumed those risks. For the reasons expressed herein, summary judgment is inappropriate, and I would remand this case for further proceedings.

## CONSTITUTIONAL ISSUES

¶60 I join in the concerns expressed by Chief Justice Gray and Justice Leaphart regarding the majority's application of constitutional principles herein. This case can be resolved on the contract issues alone, consistent with this Court's long tradition of declining to address constitutional issues where it is unnecessary. Further, while I do not dissent from the principles of environmental protection embodied in the Constitution, I do dissent from the majority's sweeping application of those principles in this case.

¶61 First, the majority's discussion of Article II, Section 3, of the Montana Constitution is incomplete. Article II, Section 3, states:

> **Inalienable rights**. All persons are born free and have certain inalienable rights. They include *the right to a clean and healthful environment* and the rights of pursuing life's basic necessities, enjoying and defending their lives and liberties, *acquiring, possessing and protecting property*, and seeking their safety, health and happiness in all lawful ways. In enjoying these rights, all persons recognize corresponding responsibilities. [Emphasis added.]

While the majority discusses the inalienable right to a clean and healthful environment contained in Article II, Section 3, the Court fails to even mention, in a case about acquiring property, the co-existent inalienable right of our people contained in Article II, Section 3, to acquire, possess and protect property. The majority omits any discussion of the interaction or balancing, if any, of these rights, which must occur when they are simultaneously at issue.

¶62 Second, the majority today holds that when the anticipated performance of a private, real property contract may potentially impact the environment, the contract's purpose is unlawful, and rescission is the appropriate remedy. Moreover, the majority has unilaterally assessed the potential for environmental contamination, despite the involvement of the regulatory bodies responsible for that determination, and on a record that leaves much in doubt. In the present case, DEQ determined that a test well should be drilled in accordance with established state and federal guidelines to determine whether contamination existed. On the basis of a letter suggesting that liability could be incurred for future contamination, the majority has determined that the DEQ's procedures for testing water pose an unconstitutional threat to the environment.

¶63 The decision leaves important questions unanswered. How certain must the potential be before the contract is deemed to have an unlawful purpose? How is a contract's potential adverse impact on the environment to be measured? How significant must that potential impact be? As the record discloses in this case, it has not been established that the plume has actually moved onto the seller's property. A misapprehension of fact-that a test well would exacerbate the existing contamination problem-has barred the test necessary to determine the plume's present location. Is a notice from the State that there may be a pollution issue affecting a parcel of property sufficient enough to prohibit use of the property? While future decisions of the Court may eventually resolve such questions, far too much is today left in doubt.

¶64 The environmental provisions of the Constitution may very well apply in this case, and may prohibit development of the proposed subdivision. However, on a record which leaves the question of potential environmental damage unsettled, the applicability of the constitutional protections cannot properly be determined. I would order a remand of this case, and after the material facts are established, the contract and constitutional principles at issue here could be properly adjudicated.

/S/ JIM RICE

Chief Justice Karla M. Gray, dissenting.

¶65 I respectfully dissent from the result the Court reaches in this case, from its analysis and application of the law regarding impossibility of performance, and from the inclusion in its opinion of constitutional issues not before us. My views overlap to some extent with those expressed by Justice Rice with regard to whether summary judgment was properly granted to Cape-France. They also overlap to some extent with Justice Leaphart's views on the inclusion of the constitutional issues in the Court's opinion. I write separately to clarify the basis for my inability to join the Court's opinion in either respect.

¶66 To begin at the beginning, I agree with the Court that our review of a district court's summary judgment is de novo and that we apply the same Rule 56, M.R.Civ.P., criteria as the district court. I also agree that it sometimes is appropriate in a case involving cross-motions for summary judgment to confine our review to the trial court's conclusions of law, on the theory that cross-motions constitute agreement that the material facts are undisputed. On the other hand, "the fact that both parties have moved for summary judgment does not establish, in and of itself, the absence of genuine issues of material fact." *Montana Metal Buildings, Inc. v. Shapiro* (1997), 283 Mont. 471, 477, 942 P.2d 694, 698 (citation omitted). In the present case, it is my view that the material facts in this case are not undisputed and that the Court fails to perform an appropriate de novo review under Rule 56.

¶67 Rule 56 requires the trial court, and this Court, to render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In this case, the District Court's order granting summary judgment to Cape-France states that the court was fully advised "[f]rom its review and consideration of the briefs and oral argument." While this statement may be mere boilerplate and not an admission by the trial court that it did not actually review the record before it, the remainder of its order does not necessarily support such an interpretation of the court's review. Indeed, the trial court merely stated--perhaps on the same basis as the related statement in this Court's opinion that the facts are undisputed--that "the parties agree that there are no genuine issues of material fact." In actual fact, however, Peed and Moore contended in their District Court brief opposing Cape-France's motion for summary judgment that Cape-France was "unable to demonstrate the absence of genuine issues of material fact in support of its Motion for Summary Judgment." They were correct in that court and they are correct in this Court, as

Justice Rice details.

¶68 In this regard, I note only a few examples of error in the District Court's order. First, the District Court states--and this Court erroneously follows a bad lead--that the DEQ informed Cape-France in a December 21, 1995, letter that the property at issue "was located within a groundwater contamination site." The problem with this purported statement of fact is that nothing in the DEQ letter says the property was within a contamination site; the letter merely advised that the contamination "appears to be extending north but the extent of the contamination is unknown." Indeed, this Court implicitly corrects its erroneous statement later in the opinion when it observes that the DEQ letter advised that the proposed subdivision "could be" in an area of groundwater contamination.

¶69 As another example, the District Court's order relates the parties' competing arguments about when knowledge of the possibility of pollution near the subject property surfaced. Cape-France argued that new and significant facts, including that the plume passed into the area, became known only after the execution of the Buy-Sell Agreement. Peed and Moore argued, on the other hand, that Cape-France was aware of the potential pollution near the subject property when the agreement was executed. Immediately following the parties' respective contentions, the District Court states that it is undisputed that Cape-France was aware that the plume was moving northwesterly towards the subject property. Mysteriously, it then goes on to state as a matter of fact that "[t]he contamination was new, unexpected, [and] unknown. . . ." These are inherently contradictory statements about a material factual issue.

¶70 Finally, in this regard, both the District Court and this Court make much of the following facts: that DEQ imposed a requirement that a test well be drilled after the agreement was executed, that Cape-France was "unwilling" to drill the test well, and that Peed and Moore were unwilling to provide Cape-France with a satisfactory indemnity agreement. The "materiality" of these facts is not at all clear to me and, to the extent the facts are material, the gloss placed on them by both courts is totally--and inappropriately--set forth in Cape-France's favor. Both courts overlook the fact that the required test well was merely that, as Justice Rice points out. Both courts also overlook the fact that the Buy-Sell Agreement places responsibility for getting the subject property through subdivision requirements and approval on Cape-France, and that the test well was merely one remaining item--arguably capable of performance and certainly not unlawful--in that process. I simply cannot join the Court in speculating that contamination either does or

will exist and that, if so, it "could" expose Cape-France to substantial financial liability and, on the basis of such speculation, concluding that Cape-France's obligation to perform according to its contract is excused.

¶71 I raise these matters only to highlight the importance--and the Rule 56 requirement--of scrutinizing the facts of record in summary judgment proceedings to determine whether material factual issues remain for trial. For these and other reasons, I would conclude that genuine issues of material fact exist in the present case which precluded summary judgment in favor of Cape-France.

¶72 More importantly, however, I disagree with this Court's discussion and application of the law of impossibility of performance. The Court begins by correctly stating Montana law on impossibility as set forth in our most recent cases on the subject: "[I]mpossibility of performance is a strict standard that can only be maintained where the circumstances truly dictate impossibility. The general rule is that, where a party to a contract obligates himself to a legal and possible performance, he must perform in accordance with the contract terms." *Barrett*, decided in 1980, and *360 Ranch*, decided in 1996, are nearly unequivocal in this regard and rightly so, since § 28-2-603, MCA, also requires that a contract be voided only where "wholly impossible of performance." Moreover, *360 Ranch* goes on to set out the few kinds of contract cases in which a district court properly could grant summary judgment on impossibility of performance. *See 360 Ranch*, 278 Mont. at 493, 926 P.2d at 263. Those examples do not include the circumstances presently before us. Rather, this is a case where, as we said in *360 Ranch*, "whether performance of a contract was impossible will be a question of fact, and summary judgment will not be appropriate." *360 Ranch*, 278 Mont. at 493, 926 P.2d at 263. As we did in that case, so must we in this case conclude, based on the record before us, that the question of impossibility of performance presents a genuine issue of material fact.

¶73 Instead of following either the substantive law or the approach contained in *360 Ranch*, however, the Court inexplicably heads off in an entirely different direction, citing to our 1977 *Smith* decision for the proposition that impossibility of performance encompasses impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved. *Smith* predated both *Barrett* and *360 Ranch*, and the referenced proposition has never since been repeated by this Court. From an outdated, one-shot opinion, the Court then goes off into every available jurisdiction and source to support its impracticability approach. My problem with the Court's approach is that it essentially ignores controlling Montana case law on impossibility of performance and totally ignores

§ 28-2-603, MCA. I cannot agree. I would remand to the District Court for further proceedings and, ultimately, for the application of existing Montana law on impossibility of performance.

¶74 Finally, with regard to the constitutional issues discussed in the Court's opinion, I agree with Justice Leaphart that we follow the long-standing and important principle that courts should avoid constitutional issues wherever possible. However, I do not agree that principle is applicable here for one simple reason: no constitutional issue was presented to the District Court and, indeed, appellants did not present such an issue to this Court. Consequently, I strenuously dissent from the Court's insertion--and resolution, on its own and without full briefing--of a nonexistent constitutional issue into this case.

¶75 This case was tried and appealed on issues of impracticability/impossibility of performance and specific performance. Whatever our respective views on those matters, the Court resolves the appeal on the basis of impossibility of performance. Having so resolved the case, however, the Court then improperly inserts a discussion of a critically important constitutional right in Montana, the development of which through case law actually presenting the issue, is in its infancy. To that extent, the discussion is dicta in its entirety and, as a result, not controlling precedent. The problem is that dicta takes on a life of its own. The bigger problem is that the Montana constitutional rights relating to the environment are hugely important and impactful to the citizens of Montana and should not be dallied with by this Court in the absence of issues being raised in the District Court and fully briefed in this Court.

¶76 For the reasons stated above, I dissent from the Court's opinion on the issue actually before us and strenuously dissent from its inappropriate insertion of the "clean and healthful" discussion, which will unnecessarily fan the flames of controversy in Montana.

/S/ KARLA M. GRAY

1. Peed is now deceased and being represented by her estate.