Justice Dirk Sandefur delivered the Opinion of the Court.
¶1 Appellant Marcy Kroschel (Kroschel) appeals the judgment of the Montana Fourth Judicial District Court affirming the judgment of the City of Missoula Municipal Court denying her motion to suppress evidence. We affirm in part, reverse in part, and remand addressing the following restated issues:
1. Did the Municipal Court correctly conclude that police had sufficient particularized suspicion to prolong an investigatory stop of Kroschel under the Fourth Amendment and §§ 46-5-401 and -403, MCA, after database checks returned no record on the name and date of birth provided?
2. Did the Municipal Court correctly conclude that police subjected Kroschel to interrogation that did not require an advisory and waiver of constitutional rights?
PROCEDURAL AND FACTUAL BACKGROUND
¶2 On August 29, 2015, Kroschel attended a University of Montana (UM) football game at Washington-Grizzly Stadium in Missoula, Montana. UM Campus Police Officer Shannon Parsons was on uniformed foot patrol at the game with the specific duty assignment of patrolling and issuing citations for underage drinking in violation of § 45-5-624, MCA (minor in possession of intoxicating substance (MIP)). On the main stadium concourse (second level), Officer Parsons encountered Kroschel and Kaitlynn O'Connell walking toward the restroom. Parsons testified that she first noticed the two young women because she saw them walking arm-in-arm, unsteady on their feet, with O'Connell physically assisting Kroschel to the restroom. Suspecting that the two had been drinking underage and concerned about Kroschel's apparent level of intoxication, Parsons approached and asked if they were okay. When they responded that they were, Officer Parsons noticed an alcoholic odor emanating from them and asked for proof of identification. O'Connell produced identification showing that she was 21 years old. When Kroschel stated that she did not have identification because it was in her coat back at her stadium seat, Parsons asked Kroschel for her UM student ID number. Kroschel answered that she was no longer a UM student and could not remember her former ID number.
¶3 Officer Parsons then asked Kroschel for her name and date of birth. Kroschel gave a misspelled name ("Marcie Krochel") and a false date of birth indicating that she was 21. Parsons ran radio dispatch checks through the UM and CJIN[1] databases which returned no record on the name and date of birth given by Kroschel. Officer Parsons later testified that, in her experience in dealing with young adults on the UM campus, the absence of a record on those databases often indicates a false name. At the Municipal Court suppression hearing, Parsons testified that she asked Kroschel for her true name *1214 and date of birth at least twice with the same result. Getting no satisfactory response, Parsons asked Kroschel to accompany her "to the station" for the purpose of ascertaining her identity.
¶4 Kroschel became highly emotional and uncooperative, refused to accompany Parsons to the station, and asserted that Parsons was interfering with her desire to go home. Officer Parsons then warned Kroschel that she was obstructing Parsons' investigation and warned further that, unlike the offense of MIP, the offense of obstructing a peace officer is a jailable offense. In her subsequent testimony, Parsons explained that her purpose in so warning Kroschel was not to threaten or coerce her but, rather, "to give her information so that she could make the decision to tell me her correct name and date of birth." When Kroschel attempted to walk away, Officer Parsons physically grabbed her by the elbow, told her that they were "going to the station," and then physically "guided" her to and down the stairway. On the way down, Kroschel began to walk compliantly and Parsons released her grip. Parsons did not formally arrest Kroschel but later testified that Kroschel was not free to go until Parsons could verify her true identity. Kroschel testified that she was crying, scared, and repeatedly told the officer that she did not want to go with her.
¶5 At the bottom of the stairway, as they approached a ground floor stadium gate, Parsons and Kroschel encountered another UM police officer on underage drinking patrol, Detective Chris Croft. Detective Croft then subjected Kroschel to a second round of questioning as to her true name and date of birth. As Croft questioned Kroschel, Officer Parsons ordered Kroschel's friend away, leaving Kroschel alone with the officers. Unable to confirm Kroschel's identity and age, and unsatisfied with her responses, the two police officers walked Kroschel to a secluded room in an adjoining concessions building connected to the stadium where they sat her down in a closed room for a third round of questioning about her true identity and date of birth.
¶6 Alone with two police officers behind a closed door in a secluded room, Kroschel continued to give the same misspelled name and false date of birth in response to Detective Croft's repeated questioning. Kroschel later testified that it was clear that she was not free to leave. Kroschel eventually relented and gave the officers her true name and date of birth. Another UM database check confirmed that she was in fact a 20-year-old UM student. After issuing Kroschel a notice to appear before the Missoula Municipal Court on the misdemeanor offenses of MIP and obstructing a police officer, Officer Parsons released Kroschel without further incident.
¶7 Kroschel appeared before the Municipal Court and later moved for suppression of the State's evidence of her age, date of birth, and the fact that she gave false information to police, on the asserted ground that the police unreasonably prolonged the initial investigative stop in violation of the Fourth Amendment of the United States Constitution, Article II, Section 11 of the Montana Constitution, and § 46-5-401, MCA. Kroschel further asserted that police subjected her to a custodial interrogation without a rights advisory in violation of the Fifth Amendment and Article II, Section 25 of the Montana Constitution. In denying the motion, the Municipal Court first ruled that Officer Parsons validly stopped and briefly questioned Kroschel on the main stadium concourse based on particularized suspicion of criminal activity as permissible under the Fourth Amendment. The Court ruled further that, though the stop ripened into a custodial interrogation which generally requires a constitutional rights advisory under the Fifth Amendment, no rights advisory was necessary in this case because the information sought by police (name, age, and date of birth) was merely non-incriminating, "basic biographical data." At a subsequent non-jury trial, the Municipal Court found Kroschel guilty of being a minor in possession of alcohol but not guilty of obstructing a peace officer. Kroschel timely appealed the Municipal Court's suppression ruling to the District Court. The District Court affirmed[2] and Kroschel now timely appeals to this Court.
*1215 STANDARD OF REVIEW
¶8 On appeal from a municipal court of record, district courts function as intermediate courts of appeal with the scope of review "confined to review of the record and questions of law." Sections 3-5-303 and 3-6-110(1), MCA ; State v. Luke , 2014 MT 22, ¶ 9, 373 Mont. 398, 321 P.3d 70.[3] On appeal of a lower court judgment following intermediate appeal, we review the lower court record independently of the district court as if appealed directly to this Court without district court review. State v. Maile , 2017 MT 154, ¶ 7, 388 Mont. 33, 396 P.3d 1270 ; Stanley v. Lemire , 2006 MT 304, ¶¶ 25-26, 334 Mont. 489, 148 P.3d 643. Upon independent review of the lower court record, our standard of review is whether the lower court's findings of fact are clearly erroneous, whether its conclusions of law are correct, and, as applicable, whether the lower court abused its discretion. State v. Davis , 2016 MT 206, ¶¶ 5-6, 384 Mont. 388, 378 P.3d 1192. Accord State v. Kasparek , 2016 MT 163, ¶ 6, 384 Mont. 56, 375 P.3d 372 (standard of review of a lower court ruling on a motion to suppress evidence is whether the court's findings of fact are clearly erroneous and whether the court correctly applied the governing law).
DISCUSSION
¶9 1. Did the Municipal Court correctly conclude that police had sufficient particularized suspicion to prolong the investigatory stop of Kroschel under the Fourth Amendment and §§ 46-5-401 and -403, MCA, after database checks returned no record on the name and date of birth provided?
¶10 The Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution similarly prohibit unreasonable searches and seizures. As a procedural component of these protections, government searches and seizures must generally occur pursuant to a judicial warrant issued on probable cause. U.S. Const. amend. IV ("no Warrants" for search or seizure "shall issue, but upon probable cause") and Mont. Const. art. II, § 11 ("No warrant to search any place, or seize any person or thing shall issue ... without probable cause"). A constitutional seizure of a person occurs when a government officer "in some way" restrains a person's liberty by means of physical force or show of authority that, under the totality of the circumstances, would cause an objectively reasonable person to believe that the person is not free to leave the presence of the officer. State v. Clayton , 2002 MT 67, ¶ 12, 309 Mont. 215, 45 P.3d 30 (citing United States v. Mendenhall , 446 U.S. 544, 552-54, 100 S.Ct. 1870, 1876-77, 64 L.Ed.2d 497 (1980) ); State v. Roberts , 1999 MT 59, ¶ 16, 293 Mont. 476, 977 P.2d 974 ; Terry v. Ohio , 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968). Even a brief restraint of a person's liberty constitutes a constitutional seizure. State v. Massey , 2016 MT 316, ¶ 9, 385 Mont. 460, 385 P.3d 544 ; State v. Martinez , 2003 MT 65, ¶ 20, 314 Mont. 434, 67 P.3d 207 ; State v. Kaufman , 2002 MT 294, ¶ 14, 313 Mont. 1, 59 P.3d 1166 ; State v. Reynolds , 272 Mont. 46, 49, 899 P.2d 540, 542 (1995) ; United States v. Cortez , 449 U.S. 411, 417, 101 S.Ct. 690, 694-95, 66 L.Ed.2d 621 (1981).[4] Except under certain recognized exceptions to the warrant requirement, warrantless searches and seizures of persons are per se unreasonable under the Fourth Amendment and Article II, Section 11 of the Montana Constitution. State v. Ballinger , 2016 MT 30, ¶ 16, 382 Mont. 193, 366 P.3d 668 ; State v. Hardaway , 2001 MT 252, ¶ 36, 307 Mont. 139, 36 P.3d 900 ; Katz v. United States , 389 U.S. 347, 358, 88 S.Ct. 507, 515, 19 L.Ed.2d 576 (1967).
¶11 A recognized exception to the warrant requirement is the temporary investigative stop, or Terry stop, as first recognized *1216 by the United States Supreme Court in Terry , 392 at 16, 88 S.Ct. at 1877, and subsequently codified in Montana at §§ 46-5-401 and -403, MCA.[5] Under this exception, a law enforcement officer may briefly stop and detain a person for investigative purposes without a warrant or probable cause for an arrest if, based on specific and articulable facts known to the officer , including rational inferences therefrom based on the officer's training and experience, the officer has an objectively reasonable, particularized suspicion that the person is engaged, or about to engage, in criminal activity. State v. Elison , 2000 MT 288, ¶ 15, 302 Mont. 228, 14 P.3d 456 ; Roberts , ¶ 12 ; Reynolds , 272 Mont. at 49-50, 899 P.2d at 542 ; State v. Gopher , 193 Mont. 189, 193-94, 631 P.2d 293, 295-96 (1981) ; Cortez , 449 U.S. at 417-18, 101 S.Ct. at 694-95 ; Terry , 392 U.S. at 16-19, 88 S.Ct. at 1877-79. See also §§ 46-5-401(1) and -403, MCA (authorizing temporary stop of a person "to obtain an account of the person's presence or conduct or to determine whether to arrest the person" upon observing the person "in circumstances that create a particularized suspicion that the person ... has committed, is committing, or is about to commit an offense"). Whether an officer had a particularized suspicion of criminal activity is a question of fact under the totality of circumstances. Kaufman , ¶ 11 ; Cortez , 449 U.S. at 417-18, 101 S.Ct. at 695.
¶12 Here, Kroschel asserts, and the State does not dispute, that Officer Parsons stopped and thus effected a constitutional seizure on Kroschel and her friend when the officer approached them, asked them if they were okay, and demanded identification including age. In turn, Kroschel does not seriously dispute the Municipal Court's finding and conclusion that Officer Parsons had sufficient particularized suspicion of underage drinking to justify the initial stop based on her articulated observations of Kroschel's "difficulty walking, her need to have a friend assist her, and the odor of alcohol" about her. Upon our review of the record, we hold that the Municipal Court correctly concluded that police had sufficient particularized suspicion under the Fourth Amendment and § 46-5-401, MCA, to temporarily stop Kroschel and investigate whether she had committed the offense of MIP.
¶13 Upon making a valid investigative stop, law enforcement officers must act with reasonable diligence to quickly confirm or dispel the predicate suspicion for the stop. United States v. Sharpe , 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). The duration and scope of an investigative stop must be carefully limited to its "underlying justification." Florida v. Royer , 460 U.S. 491, 500, 103 S.Ct. 1319, 1325-26, 75 L.Ed.2d 229 (1983). Thus, the duration and scope of a stop may not exceed what is reasonably necessary to confirm or dispel the predicate suspicion for the stop. Royer , 460 U.S. at 500, 103 S.Ct. at 1325-26 ; Terry , 392 U.S. at 17-20, 88 S.Ct. at 1878-79. Montana has codified these principles in § 46-5-403, MCA (temporary investigative stop "may not last longer than is necessary to effectuate the purpose of the stop"). See State v. Carlson , 2000 MT 320, ¶ 21, 302 Mont. 508, 15 P.3d 893 (citing § 46-5-403, MCA, and Royer ); Commission Comments, supra , § 20.03. However, judicial assessment of the reasonableness of the duration and scope of an investigative stop must recognize that the State's compelling interest in "effective law enforcement" demands that officers in the field have reasonable "latitude" to reach, follow up on, and confirm or dispel initial suspicions of criminal activity. State v. Sharp , 217 Mont. 40, 47, 702 P.2d 959, 963 (1985) ; see also State v. Seaman , 2005 MT 307, ¶ 29, 329 Mont. 429, 124 P.3d 1137 (citing Sharp in community caretaker context).
¶14 To that end, "[a]sking questions is an essential part of police investigations." Hiibel v. Sixth Jud. Dist. Ct. , 542 U.S. 177, 185, 124 S.Ct. 2451, 2458, 159 L.Ed.2d 292 (2004). "[Q]uestions concerning a suspect's identity are a routine and [permissible] part" of a typical temporary investigative *1217 stop. Hiibel , 542 U.S. at 186, 124 S.Ct. at 2458. The state has a compelling interest in enforcing the criminal law in furtherance of public order and safety. State v. Goetz , 2008 MT 296, ¶ 17, 345 Mont. 421, 191 P.3d 489 ; State ex rel. Zander v. Fourth Jud. Dist. Ct. , 180 Mont. 548, 556, 591 P.2d 656, 660 (1979). In furtherance of that compelling state interest, identification of a validly stopped suspect assists police in confirming or dispelling the particularized suspicion of criminal activity that warranted the stop, determining whether further investigation of the suspect is warranted, and informing whether the suspect is "wanted for another offense" or requires aid due to mental illness. Hiibel , 542 U.S. at 186, 124 S.Ct. at 2458.[6] Officers investigating a particularized suspicion of criminal activity "need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger" to others. Hiibel , 542 U.S. at 186, 124 S.Ct. at 2458. "The request for identity has an immediate relation to the purpose, rationale, and practical demands of" a typical temporary investigative stop. Hiibel , 542 U.S. at 188, 124 S.Ct. at 2459. Though the Fourth Amendment does not compel a person to answer questions posed by police upon a temporary investigative stop, a state law that requires a suspect to disclose his or her identity upon request incident to a valid investigative stop does not violate the Fourth Amendment. Hiibel , 542 U.S. at 188, 124 S.Ct. at 2459.
¶15 Accordingly, incident to a lawful investigative stop, Montana law enforcement officers may request a person's name, current address, and "an explanation" of the person's conduct in relation to the officer's particularized suspicion for the stop. Section 46-5-401(2)(a), MCA. Consistent with governing federal and state constitutional principles, a person may be subject to criminal liability for failing to comply with an officer's lawful request for such information. See § 45-7-302(1), MCA (obstructing a peace officer).[7] See also Hiibel , 542 U.S. at 188-89, 124 S.Ct. at 2459-60 (police "may not arrest a suspect for failure to identify himself if the request for identification is not reasonably related to the circumstances justifying the stop"). While § 46-5-401(1), MCA, does not expressly authorize police to request information other than a person's name, current address, and "an explanation" of the person's conduct, nothing in the language or legislative history of § 46-5-401(1), MCA, indicates any legislative intent to preclude police from asking other questions permissible under the Fourth Amendment within the limited scope of the stop (i.e., reasonably related in scope to the particularized suspicion that justified the stop). If not the functional or substantive equivalent of requesting a person's name and current address, demanding available proof of identification is typically likewise reasonably related to the purpose of an investigative stop for Fourth Amendment purposes. See Hiibel , 542 U.S. at 186-88, 124 S.Ct. at 2458-59.
¶16 Nonetheless, pursuant to State v. Driscoll , 2013 MT 63, 369 Mont. 270, 303 P.3d 788, Kroschel asserts that Officer Parsons improperly prolonged the duration of the investigative stop of Kroschel without a particularized basis upon which to continue to suspect that she was underage after the initial UM and CJIN database checks yielded no information contradicting the name and date of birth provided. In Driscoll , while on foot patrol during the annual Labor Day rodeo weekend in Dillon, uniformed police officers saw a young man in a bar holding a beer can. Suspecting that he was underage based on his youthful appearance, the officers approached the man and asked him how *1218 old he was. When Driscoll replied that he was 22 years old, the officers asked him for proof of identification verifying his age. When he refused to comply, the officers ordered Driscoll to accompany them outside. Driscoll , ¶ 5. Outside, in response to officers' request for his full name and date of birth, Driscoll gave them a false first name and date of birth. When a CJIN check returned no record of that name and date of birth, the officers arrested Driscoll and ultimately charged him with MIP and obstructing a peace officer. Driscoll later gave his true name which led police to his driver's license record and confirmation that he was less than 21 years old. Driscoll , ¶ 6. Driscoll subsequently moved in city court for suppression of his incriminating statements on Fourth and Fifth Amendment grounds. After the court granted the motion and dismissed the case, the State appealed to district court which then affirmed the suppression of evidence but reversed the dismissal, leaving the State to decide what to do in the wake of the suppressed evidence. Driscoll , ¶¶ 7-8.
¶17 On subsequent appeal by the State, we affirmed the suppression of evidence on the grounds that the officers' articulated observation that Driscoll was "acting defensively" was not a sufficient particularized basis upon which to prolong the stop and that the officers failed to articulate any additional facts supporting their continued suspicion that Driscoll was underage after he told them he was 22 years old. Driscoll , ¶ 15. Having disposed of the case on Fourth Amendment grounds, we did not reach Driscoll's Fifth Amendment claims. Driscoll , ¶ 15.
¶18 Here, unlike in Driscoll , Officer Parsons articulated additional facts supporting her continuing suspicion, that Kroschel had committed the offenses of MIP and obstructing a police officer, after the UM and CJIN database checks returned no record contradicting the information provided by Kroschel. In addition to her articulated observations supporting her initial suspicion that Kroschel had been drinking underage (i.e., youthful appearance, difficulty walking, need for walking assistance, and odor of alcohol about her), Officer Parsons further articulated her knowledge, based on her experience, that negative returns on UM and CJIN database name checks on young people present on the UM campus usually indicate a false name or date of birth.
¶19 Based on additional information developed during the initial lawful duration and scope of an initial investigative stop, an officer may develop new or broader particularized suspicion of criminal activity justifying expansion of the scope or duration of the stop beyond that justified by the officer's initial observations. State v. Case , 2007 MT 161, ¶ 34, 338 Mont. 87, 162 P.3d 849 ; Carlson , ¶ 21 ; Hulse v. State , 1998 MT 108, ¶¶ 40-42, 289 Mont. 1, 961 P.2d 75 ; Sharp , 217 Mont. at 46, 702 P.2d at 963. Here, unlike in Driscoll , the negative returns on the UM and CJIN database checks on the name and date of birth given by Kroschel not only did not reasonably dispel Parson's initial particularized suspicion but, rather, added an additional particularized factual basis upon which to continue to suspect that Kroschel had committed the offense of MIP and, then, obstructing by providing false information to police. Unlike in Driscoll where the officers failed to articulate additional facts to support a continuing particularized suspicion that Driscoll was underage despite his unrebutted assertion to the contrary, Officer Parsons articulated facts that reasonably gave rise to a continuing particularized suspicion sufficient to further prolong and expand the original duration and scope of the stop.
¶20 In support of their proposition that, by analogy to Driscoll , Officer Parsons did not have sufficient particularized suspicion to further prolong the duration and original scope of the stop for additional investigation of whether Kroschel gave a false name and date of birth, the special concurrences (J. Gustafson and Shea), infra , cite State v. Bauer , 2001 MT 248, ¶ 33, 307 Mont. 105, 36 P.3d 892, where we held that Article II, Sections 10 - 11 of the Montana Constitution (rights to privacy and prohibition of unreasonable searches and seizures) bar police from arresting and detaining persons stopped for non-jailable offenses absent special circumstances, such as concern for officer or public safety. Bauer , ¶ 33. While a compelling proposition in isolation, the concurrences *1219 conspicuously ignore that, though not necessarily conclusive of a false name, the negative returns on the UM and CJIN database checks gave rise to additional particularized suspicion , as articulated by the officer based on her particular experience in similar circumstances, that Kroschel had then also committed the additional offense of obstructing a peace officer, as defined by § 45-7-302(1), MCA, by knowingly giving the officer a false name and date of birth. Unlike MIP, obstructing a peace officer is a jailable offense. Section 45-7-302(3), MCA. This additional particularized suspicion clearly renders Bauer and Driscoll distinguishable and of no consequence here. We hold that Officer Parsons had sufficient particularized suspicion of criminal activity (i.e. MIP and obstructing a peace officer) to continue to detain Kroschel for further investigation after the UM and CJIN database checks returned no record on the name and date of birth provided.[8]
¶21 2. Did the Municipal Court correctly conclude that police subjected Kroschel to interrogation that did not require an advisory and waiver of constitutional rights?
¶22 The Fifth Amendment of the United States Constitution and Article II, Section 25 of the Montana Constitution protect a person from compelled self-incrimination. As a procedural safeguard of this fundamental federal and state constitutional right, law enforcement officers may not subject a person to custodial interrogation unless and until they have sufficiently advised the person of pertinent Fifth and Sixth Amendment rights pursuant to Miranda v. Arizona , 384 U.S. 436, 467-77, 86 S.Ct. 1602, 1624-29, 16 L.Ed.2d 694 (1966), and obtained a valid waiver of those rights. State v. Morrisey , 2009 MT 201, ¶¶ 28-29, 351 Mont. 144, 214 P.3d 708 ; Miranda , 384 U.S. at 467-79, 86 S.Ct. at 1624-30.[9] Except under certain recognized exceptions not at issue here, statements elicited while a person is subject to custodial interrogation are not admissible against the person in a subsequent criminal proceeding. Morrisey , ¶ 29 ; State v. Munson , 2007 MT 222, ¶ 20, 339 Mont. 68, 169 P.3d 364 ; Miranda , 384 U.S. at 476, 86 S.Ct. at 1629.[10]
¶23 For purposes of the Fifth Amendment, "interrogation" means express or implied questioning initiated by a law *1220 enforcement officer. State v. Staat , 251 Mont. 1, 6, 822 P.2d 643, 646 (1991) ; Miranda , 384 U.S. at 444, 86 S.Ct. at 1612. The term broadly includes both express questioning and "any words or actions on the part of police (other than those normally attendant to arrest [or] custody) that the police should know are reasonably likely to elicit an incriminating response." Rhode Island v. Innis , 446 U.S. 291, 300-301, 100 S.Ct. 1682, 1689-90, 64 L.Ed.2d 297 (1980). Accord Munson , ¶ 25 (citing Innis ). The focus of whether an interrogation occurred is on "the perceptions of the suspect," not the intent of the police. State v. Olson , 2003 MT 61, ¶ 18, 314 Mont. 402, 66 P.3d 297 ; Innis , 446 U.S. at 301, 100 S.Ct. at 1690.
¶24 In contrast to the less stringent standard for a Fourth Amendment "seizure," a person is in Fifth Amendment "custody" only when formally arrested by police or when police otherwise restrict the person's freedom of action in a manner or degree similar to a formal arrest. Thompson v. Keohane , 516 U.S. 99, 112, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995).[11] Accord Munson , ¶ 21-22 (quoting Thompson ). The determination of whether police restricted a person's freedom of action in a manner or degree similar to a formal arrest depends upon the totality of the circumstances of each case. State v. Dawson , 1999 MT 171, ¶¶ 33-37, 295 Mont. 212, 983 P.2d 916. The two-part determination focuses on whether a reasonable person would feel free to leave under the circumstances and the coercive nature and degree of the detention and questioning relative to that typically incident to a formal arrest. See Dawson , ¶ 33 ; Berkemer v. McCarty , 468 U.S. 420, 436-38, 104 S.Ct. 3138, 3148-49, 82 L.Ed.2d 317 (1984). Non-exclusive relevant considerations include, inter alia , whether the person affirmatively consented or requested to speak with police; the time and place of the detention and questioning; the degree of force, restraint, or threat of force used to detain or question the person; whether police moved the person to another area for questioning; whether police informed the person that he or she was not under arrest, free to leave, or free to otherwise terminate the questioning; the extent to which the police presence, manner, or posture was threatening or otherwise coercive under the circumstances; the duration of questioning; and the extent to which police confronted the person with evidence of guilt. Munson , ¶¶ 23-24 (citing various federal authorities). See also State v. Lapp , 202 Mont. 327, 331, 658 P.2d 400, 403 (1983) (applying six non-exclusive relevant factors, i.e., place of interrogation, time of interrogation, persons present, whether Miranda advisory "gratuitously given," "length and mood of interrogation," and whether suspect "arrested following questioning"). The determination of whether a person is in Fifth Amendment custody "depends upon the objective circumstances," not the "subjective views" of the suspect or police. Munson , ¶ 21.
¶25 Because a person is typically not free to leave until released by the investigating officer, a temporary investigative stop generally effects a Fourth Amendment seizure. Berkemer , 468 U.S. at 436-38, 104 S.Ct. at 3148-49. While both inherently coercive to a degree and a significant restriction on a person's freedom of action for the duration of the stop, a temporary investigative stop typically does not curtail a person's freedom of action to an extent or degree similar to a formal arrest due to the brief duration, limited scope of permissible questioning, public or non-secluded setting, and expectation of imminent release typically associated with such a stop. Berkemer , 468 U.S. at 436-38, 104 S.Ct. at 3148-49 ; see also State v. Dannels , 226 Mont. 80, 87, 734 P.2d 188, 193 (1987) ; Oregon v. Mathiason , 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) ). Due to the "comparatively" less threatening nature of a temporary investigative stop, and the only "moderate" amount of questioning permissible to confirm or dispel the particularized suspicion justifying the stop, a temporary investigative stop is typically less coercive than the relatively more *1221 intensive, secluded, and prolonged police interrogation that typically occurs incident to a formal arrest or similar circumstance. Berkemer , 468 U.S. at 436-38, 104 S.Ct. at 3148-49. Without more, the mere fact that the subject is aware that police strongly suspect him or her of criminal activity does not raise the coercive nature of a temporary stop to a level commensurate with that of a police interrogation incident to formal arrest. Dannels , 226 Mont. at 88, 734 P.2d at 193-94 ; Lapp , 202 Mont. at 331-32, 658 P.2d at 402-403 ; Beckwith v. United States , 425 U.S. 341, 345-47, 96 S.Ct. 1612, 1615-16, 48 L.Ed.2d 1 (1976). The brief detention and restraint, limited questioning reasonably related to the purpose of the stop, and other relatively less coercive circumstances typical to a temporary investigative stop do not present the same danger of coerced self-incrimination as the more prolonged, incommunicado police interrogation that warranted, and continues to warrant, the prophylactic procedural rule of Miranda . See Dawson , ¶¶ 33-37 ; Berkemer , 468 U.S. at 436-39, 104 S.Ct. at 3148-50 ; United States v. Ritchie , 35 F.3d 1477, 1485 (10th Cir. 1994). Thus, though potentially incriminating, the circumstances and limited scope of permissible questioning on a temporary investigative stop generally do not rise to the level of a Fifth Amendment custodial interrogation.
¶26 However, the permissible non-custodial questioning incident to a temporary investigative stop may nonetheless ripen into a custodial interrogation if the circumstances of the detention and related questioning evolve to approximate the more coercive nature of an incommunicado police interrogation incident to a formal arrest. Berkemer , 468 U.S. at 440, 104 S.Ct. at 3150 (motorist temporarily detained on traffic stop entitled to "full panoply" of Miranda protection if "subjected to treatment that renders him 'in custody' for practical purposes"); Miranda , 384 U.S. at 445-63, 86 S.Ct. at 1612-21 ; Ritchie , 35 F.3d at 1485-86. Accord State v. Braulick , 2015 MT 147, ¶¶ 18-19, 379 Mont. 302, 349 P.3d 508 (investigative stop in yard of assault suspect's home ripened into custodial interrogation when investigating police handcuffed him, led him to another area in yard, denied his request to leave, and asked "what's going on" and "what happened here?"); State v. Osteen , 216 Mont. 258, 264-66, 700 P.2d 188, 193 (1985) (unanticipated non-custodial late-night meeting with two officers in suspect's home ripened into custodial interrogation upon continued questioning), overruled on other grounds by State v. Loh , 275 Mont. 460, 472-73, 914 P.2d 592, 599-600 (1996) (discussing standard for permissible Fourth Amendment plain view search).
¶27 Here, the State correctly points out that police did not arrest Kroschel, handcuff her, threaten or intimidate her with brandished weapons, or physically restrain her other than by briefly grabbing her by the arm and leading her to and down the stadium stairs. Though police certainly dealt with Kroschel in a firm and authoritative manner, the officers did not initially treat her in a manner or to a degree significantly different than in a typical investigative stop where a suspect is not free to leave and police must use a modicum of physical restraint to prevent an uncooperative person from leaving. However, though Officer Parsons had continuing particularized suspicion of criminal activity sufficient to prolong her investigative stop of Kroschel under the Fourth Amendment, the encounter began to progressively escalate in coercive nature beyond a typical temporary investigative stop when the officer threatened her with prosecution on a jailable offense, told her they were going "to the station," and forcefully "guided her" to and down the stadium stairs with the stated and apparent intent to take her there. The coercive nature of the encounter escalated a second time when another police officer joined in and subjected Kroschel to a second round of questioning in a more remote location (downstairs near the stadium exit) while the first officer ordered Kroschel's friend away, thereby isolating her in the custody of the police. The coercive nature of the encounter escalated yet again when, after expressly or implicitly threatening her with arrest and prosecution on a jailable offense and making it clear that she would not be free to go until she told them what they wanted to hear, police took Kroschel to an even more secluded and confined area for a third-round of *1222 indefinite questioning, this time in a closed room alone with two uniformed officers.
¶28 The State asserts that Kroschel was not in Fifth Amendment custody because her detention was "no more severe" than the temporary detentions that did not constitute custody in Dawson and Elison . In Dawson , several Billings police officers were in the process of executing a search warrant in a motel room in connection with illegal transactions involving drugs, stolen property, and bad checks. Dawson , ¶¶ 5-6. In response to knocking on the motel room door, an officer opened the door to an unidentified man who walked into the open doorway and asked for the suspect in the investigation by name. Dawson , ¶¶ 5-6 and 19. In response, the officer told the man that he intended to perform an officer-safety pat-down search and asked if the man had any weapons, drugs, or needles on his person. Dawson , ¶ 7. After the man replied that he had "some smoke" in his coat pocket, the officer physically turned him around, directed him to put his hands on the wall, and conducted a brief pat-down search that led to his arrest for possession of methamphetamine and drug paraphernalia. Dawson , ¶¶ 7 and 28-33. As pertinent here, the District Court rejected the defendant's subsequent assertion that the officer violated his right to be free from self-incrimination by questioning him without a Miranda advisory incident to a Fourth Amendment stop and frisk. Dawson , ¶¶ 28-33. Noting that the temporary stop, related questioning, and frisk took place on particularized suspicion of criminal activity, lasted only 2-3 minutes, and did not involve significant physical restraint, we held that the stop did not ripen into a Fifth Amendment custodial interrogation under the totality of the circumstances. Dawson , ¶¶ 34-37.
¶29 In Elison , a citizen observer riding with a patrolling police officer reported what appeared to be another driver smoking a marijuana pipe behind the wheel of a vehicle at a Billings intersection. After stopping the vehicle, ordering the driver back into his vehicle, smelling a marijuana odor, observing signs of marijuana intoxication, observing the driver reach down between the seats of his vehicle, and then ordering the driver to exit and put his hands on the vehicle, the police officer conducted a pat-down search. Elison , ¶¶ 6-9. The officer next presumptively asked the man what happened to the marijuana pipe and whether there was marijuana in the vehicle. When the man answered that the marijuana was behind the driver's seat, the officer immediately looked in that location and found a small canister containing marijuana and drug paraphernalia. Elison , ¶ 9. Following his arrest, the man moved for suppression of the evidence on the asserted ground, inter alia , that the officer unlawfully questioned him without a Miranda warning and waiver. Elison , ¶¶ 24-25. Citing Berkemer , we held that, despite their potentially incriminating nature, the officer's questions were well within the scope of the predicate particularized suspicion for the stop. Elison , ¶ 32. Further noting that the officer did not handcuff the man prior to arrest, the questioning occurred in a public place, the brief duration of the stop, and that the officer gave no indication that the duration of the stop would be indefinite, we held that the stop and related questioning did not ripen into a Fifth Amendment custodial interrogation under the circumstances. Elison , ¶¶ 32-33.
¶30 In contrast to the brief detentions and related questioning at issue in Dawson and Elison , the duration of the police detention and questioning of Kroschel was much longer than a few minutes. Further, in Dawson and Elison , police questioned the suspects in the public and semi-public places in which they stopped them and then asked only a limited number of questions (no more than 2-3 each). Dawson , ¶¶ 5-7 and 19 ; Elison , ¶¶ 6-9. Here, police twice moved Kroschel against her will to increasingly secluded areas for questioning-first away from the main stadium concourse down to a stadium exit while the game was in progress and then out of the stadium into a totally secluded adjoining room where they subjected her to closed-door questioning alone in the presence of two uniformed police officers. By the time police were questioning Kroschel in the secluded concession room, they had subjected her to repeated questioning about the same matter in three distinct rounds of questioning. Further, unlike in Dawson and Elison , the officers repeatedly questioned Kroschel under a not-too-subtle *1223 threat of arrest and prosecution on a jailable offense, all the while making it clear that she could gain her release only by giving them the incriminating information they clearly sought.
¶31 At the point that Officer Parsons physically "guided" Kroschel down the main concourse stairs to take her "to the station" against her will under a clear threat of arrest and incarceration on a jailable offense, this was no longer the brief and only moderately-coercive situation contemplated in Terry, Berkemer , Dawson , and Elison where, incident to a valid investigative stop, police briefly detained a suspect in the field and asked for the person's name, age, and account of the person's presence or conduct to confirm or dispel the initial particularized suspicion for the stop. Nor was this the situation contemplated in Hulse where, during the lawful course of an initial temporary investigatory stop, police developed additional particularized suspicion warranting further investigation, including limited related questioning regarding the original or newly suspected criminal activity. Both of those permissible Fourth Amendment scenarios had already transpired as early as the point when Officer Parsons physically "guided" Kroschel downstairs to go "to the station" against her will, and certainly at the point that the officers subsequently took her into another building for a third round of questioning, this time alone in a secluded closed room dominated by two uniformed police officers. This was a situation where, after the exhaustion and failure of initial interrogative efforts incident to a valid temporary investigative stop, police significantly upped the ante, i.e., the level of coercion, similar in coercive degree to a formal, post-arrest incommunicado interrogation. The Municipal Court clearly recognized as much in concluding that the circumstances could have "constitute[d] probable cause for arrest" and then analogized the isolated concession room questioning to a post-arrest or pre-citation custodial inquiry regarding "the basic biographical data necessary" to complete booking or issue a "citation."
¶32 Pursuant to Pennsylvania v. Muniz , 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), and California v. Byers , 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971), the State asserts that, even if police ultimately subjected Kroschel to a custodial interrogation as recognized by the Municipal Court, no Fifth Amendment violation occurred because police sought only her correct name and date of birth, items of information generally not inherently incriminating or testimonial and thus not subject to Fifth Amendment protection. In Muniz , the Supreme Court considered inter alia whether police inquiries regarding a suspect's name, age, address, and date of birth during post-arrest, station house DUI processing were subject to Fifth Amendment protection. Muniz , 496 U.S. at 584-86, 110 S.Ct. at 2641-42. While rejecting the state assertion that such questioning did not constitute Fifth Amendment interrogation because police were not seeking the information for investigative or incriminating purposes, the Court nonetheless held that the questioning was not subject to Fifth Amendment protection because the information fell within the " 'routine booking question' exception"-questions asked for administrative "record-keeping purposes only" to obtain the "biographical data necessary to complete [post-arrest] booking or pretrial services." Muniz , 496 U.S. at 599-602, 110 S.Ct. at 2649-50.
¶33 In Byers , the Supreme Court considered the narrow issue of whether California's motor vehicle accident "stop and report" statute (requiring motorists involved in traffic accidents to stop and self-identify by name and address[12] ) violated the Fifth Amendment protection against self-incrimination. Byers , 402 U.S. at 425, 91 S.Ct. at 1536. Finding the primary purpose of the California statute to be non-incriminating, facially neutral, and regulatory in nature (i.e., to facilitate determination and resolution of attendant civil liabilities) with only an indirect potential for incrimination (via disclosure of information that is itself not incriminating but may combine with or lead to independently incriminating evidence), the Court held that the required stop and disclosure of a person's name and address was not sufficiently incriminating or testimonial to implicate *1224 Fifth Amendment protection. Byers , 402 U.S. at 427-34, 91 S.Ct. at 1537-41.
¶34 Here, unlike in Muniz and Byers , police were not questioning Kroschel either for a generally non-incriminating regulatory purpose or post-arrest administrative purpose (or analogous post-probable cause citation purpose).[13] Rather, after initially ascertaining that Kroschel and her friend did not require medical or other assistance, the sole purpose of the police questioning was to further a criminal investigation-to confirm or dispel particularized police suspicion that Kroschel had committed the offense of MIP and, as the stop developed, the related offense of obstructing a police officer. Unlike the at most indirectly incriminating biographical information at issue in Muniz and Byers , Kroschel's age and date of birth were directly incriminating under the circumstances of this case. Kroschel's age, proof of which was an invariable function of her name and date of birth, was an essential element of the offense of MIP, the very offense in regard to which the police were detaining and interrogating her. See § 45-5-624(1), MCA. At the point Kroschel first gave false information, her name and date of birth also became the direct proof of an essential element of the related offense of obstructing a police officer as initially threatened and ultimately charged. See § 45-7-302(1), MCA.
¶35 "The Fifth Amendment ... protects an accused from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." Muniz , 496 U.S. at 589, 110 S.Ct. at 2643. "A statement, expression, or conduct is testimonial ... if it explicitly or implicitly communicates or relates a factual assertion, knowledge, or thought from the suspect's mind." Muniz , 496 U.S. at 594-95, 110 S.Ct. at 2646-47. "Testimonial evidence at least includes all responses to questions that could elicit an incriminating response." Muniz , 496 U.S. at 596-97, 110 S.Ct. at 2648. Unlike the only indirectly incriminating biographical information in Muniz and Byers , Kroschel's correct name and date of birth were directly incriminating and available only from her mind under the circumstances of this case. Contrary to the State's assertion, Muniz and Byers are thus clearly distinguishable and of no consequence here. See also Hiibel , 542 U.S. at 190-91, 124 S.Ct. at 2461 (distinguishing compelled disclosure of name as non-testimonial where not directly incriminating from compelled disclosure under circumstances presenting reasonable danger of self-incrimination);[14] Byers , 402 U.S. at 428-29, 91 S.Ct. at 1538 (distinguishing compelled disclosure of only indirectly incriminating information from "compelled disclosures" which "will themselves directly *1225 'confront' " the suspect "with substantial hazards of self-incrimination"); United States v. Disla , 805 F.2d 1340, 1347 (9th Cir. 1986) (post-booking custodial inquiry for defendant's address subject to 5th Amendment and Miranda where address "related to" an element of the crime that that police suspected defendant of committing); United States v. Mata-Abundiz , 717 F.2d 1277, 1280 (9th Cir. 1983) (post-booking question regarding defendant's resident country subject to 5th Amendment and Miranda where answer constituted proof of an essential element of the subject crime and holding that non-incriminating biographical information routinely requested incident to arrest and booking not subject to booking exception if "reasonably likely to elicit an incriminating response in a particular situation"). Under the particular circumstances of this case, the disclosure of Kroschel's name and date of birth were directly incriminating and highly testimonial thus implicating Fifth Amendment protection.
¶36 The narrow purpose of the Miranda rule is to minimize the risk of involuntary self-incrimination in the inherently coercive circumstances of "incommunicado interrogation" in a "police-dominated" environment. Miranda , 384 U.S. at 445-63, 86 S.Ct. at 1612-21. Though initially starting and progressing as a valid temporary investigative stop, with permissible non-custodial interrogation reasonably related thereto, the permissible non-custodial interrogation evolved and ripened into an incommunicado interrogation in a secluded, police-dominated environment under circumstances that were highly coercive in their totality. Kroschel's eventual disclosure of her true name and date of birth, and the resulting police confirmation thereof, resulted from a Fifth Amendment custodial interrogation seeking directly incriminating information without a Miranda advisory and waiver. Consequently, the resulting State's evidence of Kroschel's age, date of birth, and the fact that she gave false information to police was inadmissible pursuant to the exclusionary rule of Miranda . See Morrisey , ¶ 29 ; Munson , ¶ 20 ; Miranda , 384 U.S. at 476, 86 S.Ct. at 1629. Therefore, we hold that the Municipal Court erroneously denied Kroschel's motion to suppress evidence.
CONCLUSION
¶37 We hold that the Municipal Court correctly concluded that Officer Parsons had sufficient particularized suspicion of criminal activity under the Fourth Amendment, Article II, Section 11 of the Montana Constitution, and § 46-5-401, MCA, to initially stop Kroschel and briefly question her about her name, age, and conduct regarding the offense of minor in possession of alcohol. We hold further that the Municipal Court correctly concluded that Officer Parsons had sufficient particularized suspicion of criminal activity to continue to detain Kroschel for further investigation for a reasonable time after the initial UM and CJIN database checks returned no record on the name and date of birth provided. However, under the totality of the circumstances of this case, we hold that the continuing temporary investigative stop and related non-custodial interrogation ripened into a custodial interrogation without a Miranda advisory and waiver in violation of the Fifth Amendment and Article II, Section 25 of the Montana Constitution. Therefore, we hold that the Municipal Court erroneously denied Kroschel's motion to suppress evidence under the particular facts and circumstances of this case.
¶38 Affirmed in part, reversed in part, and remanded.
We concur:
MIKE McGRATH, C.J.
JIM RICE, J.
BETH BAKER, J.
Justice Ingrid Gustafson, specially concurring.
¶39 While I concur with the majority that this matter should be reversed and remanded to the District Court to grant Kroschel's motion to suppress evidence, I do not agree with the majority's conclusion that police had sufficient particularized suspicion to prolong the investigatory stop after database checks *1226 returned no record on the name and date of birth provided.
¶40 The majority concludes, "Here, unlike in Driscoll , the negative returns on the UM and CJIN database checks on the name and date of birth given by Kroschel ... added an additional particularized factual basis upon which to continue to suspect that Kroschel had committed the offense of MIP ...." Opinion, ¶ 19. The majority's attempt to distinguish this case from Driscoll is, at best, strained. In Driscoll , Driscoll was in a bar, holding an alcoholic beverage. Based on Driscoll's youthful appearance, officers approached him and asked his age. When he reported he was twenty-two years old, officers then requested proof of identification verifying his age. He declined to provide such. Driscoll , ¶ 5. The officers then requested Driscoll step outside and provide his name and date of birth. Driscoll , ¶¶ 5-6. Driscoll gave them a false name and date of birth. The name and date of birth returned no record in the CJIN database. The officers immediately arrested Driscoll and charged him with MIP and obstructing a peace officer. Driscoll , ¶¶ 6-7.
¶41 Here, the salient facts are nearly identical to Driscoll . Kroschel and her friend were walking arm-in-arm in an unsteady manner. Officer Parsons approached the two women and testified she smelled alcohol on them. Officer Parsons requested proof of identification verifying their age. Kroschel declined to provide identification because it was back in her coat pocket. Officer Parsons requested Kroschel's name and date of birth.[1] Kroschel gave Officer Parsons her name, albeit misspelled, and a false date of birth. Kroschel's name and date of birth returned no record in the UM and CJIN databases. Officer Parsons then asked Kroschel to accompany her "to the station." Here, Officer Parsons had nearly identical information regarding Kroschel as the officers had regarding Driscoll.
¶42 Despite the similar facts, the majority distinguishes Driscoll because "Officer Parsons articulated additional facts supporting her continuing suspicion." Opinion, ¶ 18. The majority asserts, in addition to the articulated observations (similar to those articulated in Driscoll ), Officer Parsons had knowledge, based on experience, "that negative returns on UM and CJIN database name checks on young people present on the UM campus usually indicate a false name or date of birth." Opinion, ¶ 18. However, the majority fails to recognize the officers in Driscoll clearly possessed the same knowledge, because the officers arrested Driscoll when the CJIN check returned no record of the name and date of birth he provided. Driscoll , ¶ 6.
¶43 The majority also distinguishes Driscoll because "the negative returns on the UM and CJIN database checks gave rise to additional particularized suspicion , as articulated by the officer based on her particular experience in similar circumstances, that Kroschel had then also committed the additional offense of obstructing a peace officer." Opinion, ¶ 20. However, Driscoll was also charged with both MIP and obstructing a peace officer after he provided a false name and date of birth. Driscoll , ¶¶ 6-7. In Driscoll , we stated that "the officers failed to articulate any reason in their report for continuing their questioning of Driscoll after he responded that he was 22." Driscoll , ¶ 14. Therefore, without more facts, the investigatory stop in Driscoll should have stopped when Driscoll stated he was twenty-two years old (prior to running his name and date of birth through any database). Driscoll , ¶¶ 14-15. The majority's reasoning that the databases search constitutes additional articulated facts to extend the investigatory stop fails to recognize that, based on Driscoll , when Kroschel gave Officer Parsons her name and date of birth-stating she was over the drinking age-the investigatory stop *1227 should have ended. Furthermore, Kroschel repeatedly stated the same name and date of birth to Officer Parsons. Opinion, ¶ 3. Based on Driscoll , the investigatory stop should have ended after Kroschel provide a name and date of birth, because at that point Officer Parsons had no articulable facts that Kroschel was underage other than Officer Parsons's assumption that college students lie. At a minimum, the investigatory stop should have ended when the databases returned nothing on the name and date of birth given by Kroschel because the negative return failed to give rise to any additional articulable facts that Kroschel was underage. Nevertheless, the majority's assumption that the negative result in the databases gave Officer Parsons cause to extend the scope of the investigatory stop is contrary to our holding in Driscoll .
¶44 The record of the Municipal Court proceeding reflects that Officer Parsons observed Kroschel's companion, not Kroschel, to be unsteady on her feet. Neither student was carrying a drink. Officer Parsons testified that she could smell alcohol. The focus appears to have shifted to Kroschel based on her recalcitrance and refusal to answer questions, rather than articulable suspicions she had committed a crime. The testimony reflects that Kroschel was then subjected to questioning outside the scope of the statute, and was not permitted to leave. Consistent with our holding in Driscoll , I would conclude Officer Parsons did not have sufficient particularized suspicion of criminal activity to continue to detain Kroschel for further investigation after the UM and CJIN database checks returned no record on the name and date of birth provided.
¶45 Not only did Officer Parsons lack a basis for the stop under the Fourth Amendment, the Montana Constitution more expansively protects citizens' rights from unreasonable searches and seizures and invasions of their privacy. Mont. Const. art. II, §§ 10 and 11. This Court has previously held it is unreasonable for a police officer to arrest and detain a person for a non-jailable offense when there are no circumstances to justify an immediate arrest. State v. Bauer , 2001 MT 248, ¶ 33, 307 Mont. 105, 36 P.3d 892. In the absence of special circumstances such as a concern for the safety of the offender or the public, a person stopped for a non-jailable offense such as a MIP "should not be subjected to the indignity of an arrest and police station detention when a simple, non-intrusive notice to appear pursuant to § 46-6-310(1), MCA, will serve the interests of law enforcement." Bauer , ¶ 33.
¶46 The holding in Bauer is consistent with the legislative history of § 46-5-401, MCA. H.B. 40, 58th Leg. (2003). Representative Brad Newman carried the bill for the Montana Department of Justice. Hearing on Mont. H.B. 40, 58th Leg., before the S. Comm. on Judiciary at 11 (March 11, 2003). The original bill draft provided that an officer could "demand" a name and address from a citizen even if she is not operating a motor vehicle. Mont. H.B. 40.01, 58th Leg. (2003). The Legislature rejected the verb "demand" in favor of a mere "request" for a name and address. Mont. H.B. 40.03, 58th Leg. (2003).
¶47 Officer Parsons's extended investigatory stop detaining Kroschel was unconstitutional because MIP is a non-jailable offense and no special circumstances were present to justify detention. In fact, Officer Parsons specifically dispelled any special circumstances by asking Kroschel if she was okay, to which she replied affirmatively. In accordance with Bauer and § 46-5-401, MCA, Officer Parsons's investigatory stop for a MIP should have ended by citing Kroschel for MIP at the site of the initial stop or letting her go without citation. The majority's opinion fails to set a clear line as to how long an investigatory stop can extend when no special circumstances or probable cause exists for immediate arrest. Therefore, Officer Parsons's repeated demands for Kroschel's name and date of birth exceeded the scope of the statute and unlawfully detained Kroschel for a non-jailable offense because there were no circumstances to justify immediate arrest.
¶48 I concur with the majority's conclusion that the stop ripened into a custodial interrogation without a Miranda advisory in violation of the Fifth Amendment and Article II, Section 25 of the Montana Constitution such *1228 that Kroschel's motion to suppress evidence was erroneously denied.
Judge Elizabeth Best joins in the specially concurring Opinion of Justice Gustafson.
Justice James Jeremiah Shea, specially concurring.
¶49 I join Justice Gustafson's Concurrence and Dissent because it crafts a bright line for what constitutes reasonably necessary detention and investigation when an individual is suspected of committing a non-jailable offense. Beyond that, however, I write separately because it bears noting that, as the majority acknowledges, this case is ultimately being resolved on Fifth Amendment grounds. Opinion, ¶ 20, n.8. Thus, the ostensible holding of Issue One is effectively an advisory opinion, if not outright dicta. The majority states:
Since we ultimately resolve this case on Fifth Amendment grounds, we need not address Kroschel's additional Fourth Amendment and related statutory contention that, even if police permissibly prolonged the initial stop after the UM and CJIN database checks returned no record contradicting the information given by Kroschel, her continued detention and questioning soon evolved into an unreasonably prolonged constitutional seizure and statutory detention after the second round of questioning near the stadium exit developed no new facts supporting a continuing particularized suspicion that Kroschel was underage or provided false information to police.
Opinion, ¶ 20, n.8. In fact, since we ultimately resolve this case on Fifth Amendment grounds, we need not address any of Kroschel's Fourth Amendment and related statutory contentions. Since the Court is unanimous in its conclusion that the police violated Kroschel's Fifth Amendment rights and the evidence should be suppressed on that basis, I view an advisory opinion on the scope of any Fourth Amendment violations as both unnecessary and imprudent. If the Court is determined to wade into that end of the pool, however, I think it is incumbent upon us to get both feet wet and not simply ignore Kroschel's contention that "her continued detention and questioning soon evolved into an unreasonably prolonged constitutional seizure and statutory detention ...." Opinion, ¶ 20, n.8. Otherwise, it's not clear to me what advice the advisory part of the majority's opinion is offering.
¶50 The majority concludes "Officer Parsons had sufficient particularized suspicion of criminal activity ... to continue to detain Kroschel for further investigation after the UM and CJIN database checks returned no record on the name and date of birth provided." Opinion, ¶ 20. But as the majority notes, "the duration and scope of a stop may not exceed what is reasonably necessary to confirm or dispel the predicate suspicion for the stop." Opinion, ¶ 13 (citing Royer , 460 U.S. at 500, 103 S.Ct. at 1325-26 ; Terry , 392 U.S. at 17-20, 88 S.Ct. at 1878-79 ). In this case, the predicate suspicion was that Kroschel was a MIP, a non-jailable offense. This necessarily begs the question: What further investigation is reasonably necessary and appropriate when the predicate suspicion is a non-jailable offense? As Justice Gustafson correctly notes in her Concurrence and Dissent, we have already answered that question in Bauer . Gustafson Concurrence and Dissent, ¶ 7.
¶51 In Bauer , we held that it is unreasonable for a police officer to arrest and detain a person for a non-jailable offense when there are no circumstances to justify an immediate arrest. Bauer , ¶ 33. The special circumstances we identified in Bauer were "a concern for the safety of the offender or the public." Bauer , ¶ 33. As Justice Gustafson notes, there were no such special circumstances present here. Gustafson Concurrence and Dissent, ¶ 9. Thus, there was no basis for Kroschel's continued detention.
¶52 Officer Parsons was on uniformed foot patrol at the football game "with the specific duty assignment of patrolling and issuing citations for underage drinking in violation of § 45-5-624, MCA...." Opinion, ¶ 2 (emphasis added). If Officer Parsons thought she had a valid basis to cite Kroschel for MIP, she could have issued her a citation on the spot, consistent with her specific duty assignment. Yet, as the majority Opinion aptly describes, this situation escalated into three *1229 rounds of questioning, culminating in a custodial interrogation by two officers in a secluded room-all to investigate a non-jailable offense. The majority Opinion's endorsement of a nebulous right to continue to detain for further investigation brings little, if any, clarity to this situation that may prevent such an escalation in the future. Under these circumstances, it seems that the interests of law enforcement-as well as our Constitution-would be better served by "a simple, non-intrusive notice to appear ...." Bauer , ¶ 33. I therefore agree with Justice Gustafson's conclusion that "[i]n accordance with Bauer and § 46-5-401, MCA, Officer Parsons's investigatory stop for a MIP should have ended by citing Kroschel for MIP at the site of the initial stop or letting her go without citation." Gustafson Concurrence and Dissent, ¶ 9.

Criminal Justice Information Network database.

In contrast to the Municipal Court ruling that police validly questioned Kroschel under a Fifth Amendment exception that allows custodial interrogation regarding non-incriminating information without a rights advisory, the District Court affirmed on a different ground, that the Fifth Amendment did not apply because police did not subject Kroschel to a custodial interrogation.

The Municipal Court of the City of Missoula is a court of record as defined by § 3-6-101(1), MCA.

See also § 45-2-101(73), MCA (defining a "stop" as "the temporary detention of a person that results when a peace officer orders the person to remain in the peace officer's presence").

See State v. Bar-Jonah , 2004 MT 344, ¶ 42, 324 Mont. 278, 102 P.3d 1229 (noting Montana codification of constitutional principles); Comments of Commission on Criminal Procedure §§ 20.01 -20.03 (Jan. 10, 1989), File No. 88-559, in the collection of the Clerk of the Montana Supreme Court (hereinafter Commission Comments).

Accord Hayes v. Florida , 470 U.S. 811, 816, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985) ("person may be stopped" upon particularized suspicion of criminal activity "in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information"); United States v. Hensley , 469 U.S. 221, 229, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) ("the ability to briefly stop [a suspect], ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice").

As pertinent, a "person commits the offense of obstructing a peace officer ... if the person knowingly obstructs, impairs, or hinders" the officer's "enforcement of the criminal law" or "performance of a governmental function." Section 45-7-302(1), MCA.

Since we ultimately resolve this case on Fifth Amendment grounds, we need not address Kroschel's additional Fourth Amendment and related statutory contention that, even if police permissibly prolonged the initial stop after the UM and CJIN database checks returned no record contradicting the information given by Kroschel, her continued detention and questioning soon evolved into an unreasonably prolonged constitutional seizure and statutory detention after the second round of questioning near the stadium exit developed no new facts supporting a continuing particularized suspicion that Kroschel was underage or provided false information to police.

The substantive focus of the Fifth Amendment protection is whether a person voluntarily made incriminating statements or whether they were the product of police coercion. See , e.g. , State v. Eskew , 2017 MT 36, ¶ 14, 386 Mont. 324, 390 P.3d 129 ; Morrisey , ¶¶ 29-30 ; Dickerson v. United States , 530 U.S. 428, 432-34, 120 S.Ct. 2326, 2330-31, 147 L.Ed.2d 405 (2000) (recognizing pre-Miranda essence of 5th Amendment protection). See also § 46-13-301, MCA (codifying standard of Rogers v. Richmond , 365 U.S. 534, 542-49, 81 S.Ct. 735, 739-44, 5 L.Ed.2d 760 (1961) (essential Fourteenth Amendment question is whether incriminating statements were voluntary, i.e., "whether the behavior of [state] law enforcement officials was such as to overbear [a suspect's] will to resist and bring about confessions not freely self-determined")); Malloy v. Hogan , 378 U.S. 1, 6, 84 S.Ct. 1489, 1492-93, 12 L.Ed.2d 653 (1964) (applying Fifth Amendment to state action by incorporation through 14th Amendment due process clause); Mapp v. Ohio , 367 U.S. 643, 656-57, 81 S.Ct. 1684, 1692, 6 L.Ed.2d 1081 (1961) (viewing Rogers as a pre-Incorporation Doctrine enforcement of the Fifth Amendment right against state-compelled self-incrimination as a matter of Fourteenth Amendment due process). On appeal, Kroschel does not directly challenge the actual voluntariness of her incriminating statements under substantive Fifth Amendment standards.

For recognized exceptions to the Miranda exclusionary rule, see New York v. Quarles , 467 U.S. 649, 655-59, 104 S.Ct. 2626, 2631-33, 81 L.Ed.2d 550 (1984) (public safety exception), and Harris v. New York , 401 U.S. 222, 224-26, 91 S.Ct. 643, 645-46, 28 L.Ed.2d 1 (1971) (use of otherwise voluntary statements for impeachment purposes). However, regardless of application of the procedural Miranda rule, an "actually coerced" statement, i.e., an involuntary statement, is inadmissible for any purpose. Morrissey , ¶ 29 (citing Kansas v. Ventris , 556 U.S. 586, 590, 129 S.Ct. 1841, 1845, 173 L.Ed.2d 801 (2009) ).

But see Miranda , 384 U.S. at 444-45, 86 S.Ct. at 1612 (more broadly defining "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way " (emphasis added)).

See similarly, §§ 61-7-103 through -109, MCA.

We further distinguish the circumstances of this case from the situation where, incident to a valid investigatory traffic stop, police demand to see a motorist's vehicle registration, license to operate a motor vehicle, and proof of insurance pursuant to §§ 46-5-401(2)(a), 61-3-322(3), 61-5-116, and 61-6-302(2), MCA, in furtherance of the state's broad power and authority to regulate the ownership, operation, and safety of motor vehicles. See also Muniz , 496 U.S. at 590-92, 110 S.Ct. at 2644-45 (Fifth Amendment protects against compelled communication of information but not against police observation, searches, or seizure of non-testimonial physical evidence including, inter alia , requiring a suspect to perform a "volitional act" to permit to allow observation or discovery of physical evidence or characteristics even though incriminating including, inter alia , requiring a suspect to participate in a line-up, repeat a phrase or read a passage to display the physical characteristics the suspect's voice or manner of speech, provide a handwriting sample, submit to a physical examination, or provide a physical sample of breath or blood. Muniz , 496 U.S. at 592-94, 110 S.Ct. at 2645-46.

In Hiibel , the Supreme Court rejected a defendant's claim that his conviction for violating a Nevada statute similar to § 46-5-401(2)(a), MCA, requiring a person to self-identify incident to a valid Terry stop, violated his Fifth Amendment right against self-incrimination. Hiibel , 542 U.S. at 180-91, 124 S.Ct. at 2455-61. The distinguishing factor noted by the Court was that Hiibel "refused to identify himself only because he thought his name was none of the officer's business" rather than on "any articulable real and appreciable fear that his name would be used to incriminate him, or that it would 'furnish a link in the chain of evidence needed to prosecute him.' " Hiibel , 542 U.S. at 190-91, 124 S.Ct. at 2461. Foreseeing the Fifth Amendment matter at issue here, the Court nonetheless noted that "a case may arise where there is a substantial allegation that furnishing identity at the time of a stop would have given the police a link in the chain of evidence needed to convict the individual of a separate offense."

The majority fails to recognize requesting a date of birth is not within the information an officer may request under § 46-5-401(2)(a), MCA (allowing a peace officer to "request the person's name and present address and an explanation of the person's actions"). One's date of birth is an element of the offense of MIP. Section 45-5-624(1), MCA ("A person under 21 years of age commits the offense of possession of an intoxicating substance if the person knowingly consumes or has in the person's possession an intoxicating substance."). Therefore, when Officer Parsons asked Kroschel for her date of birth, she was asking Kroschel to violate her Fifth Amendment right against self-incrimination without having been read her Miranda rights.